**\*E-Filed 9/23/11\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DENISE GREEN,<br><br>    Plaintiff,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO and the SAN FRANCISCO POLICE DEPARTMENT, public entities; SARGEANT JA HAN KIM; OFFICER ESPARZA; OFFICER PEDERSEN; and DOES 1-10, individually,<br><br>    Defendants.<br>_____/ | No. C 10-02649 RS<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |

## I. INTRODUCTION

This suit arises out of the mistaken belief that plaintiff Denise Green was driving a vehicle with a license plate that did not match her car and that had been reported stolen. The Automatic License Plate Recognition System (ALPRS) utilized by Officer Alberto Esparza of the San Francisco Police Department (SFPD) indicated that the plate on Green's Lexus, 5SOW<u>3</u>50, matched 5SOW<u>7</u>50, which was reported as belonging to a stolen GMC. Sergeant Ja Han Kim of the SFPD heard an exchange between Esparza and the dispatcher confirming that 5SOW750 was stolen without realizing that Esparza had not been able to confirm visually a match between that number and Green's plate. Kim concluded he had reasonable suspicion to conduct a "high risk felony stop"

(alternatively, "felony stop") of Green's vehicle, which involved ordering her from her car at gunpoint and handcuffing her. After Green was detained in that manner, Kim learned that there had been a mistake.

Green subsequently filed suit against the City and County of San Francisco and the SFPD (collectively, the "City") and Sergeant Kim[1] alleging: (1) Fourth Amendment violations by Kim for unreasonable search and seizure and unreasonable use of force; (2) Fourth Amendment violations by the City; (3) violation of Cal. Civ. Code § 52.1; (4) intentional infliction of emotional distress (IIED); (5) assault; and (6) negligence. Green moves for partial summary judgment on her Fourth Amendment claim against Kim and on her California Civil Code section 52.1 claim against all defendants. Defendants move for summary judgment on the grounds that Kim had reasonable suspicion to stop Green's vehicle and that he used reasonable force. Based on the parties' submissions and oral argument, and for the reasons stated below, defendants' motion for summary judgment is granted, and plaintiff's motions for partial summary judgment are denied.

## II. BACKGROUND

The following facts are undisputed. On March 29, 2009, around 11:15 p.m., Green drove southbound on Mission Street in San Francisco in her burgundy Lexus ES 300. She passed the patrol car of Officers Esparza and Pedersen. The officers were parked facing northbound while they conducted a traffic stop. Their patrol car was equipped with an ALPRS. With this technology, infrared cameras mounted on the patrol car capture images of license plates on passing vehicles. Additionally, the patrol car contains a computer including software that compares each captured plate number with those contained in a database downloaded onto it. If the software finds a match between the license plate and the numbers in the database, the captured image is displayed on the computer screen next to the license plate number found in the database.

After Green drove past the patrol car, the ALPRS alerted Officers Esparza and Pedersen that her plate was a match with one listed in the database for a stolen vehicle. In fact, Green's plate number is 5SOW350 and the plate listed in the database was 5SOW750. Although officers know that an ALPRS can misread plates, they can confirm the match either by looking directly at the plate

---

[1] Officer Esparza and his partner Officer Robert Pedersen were also named as defendants, but have been voluntarily dismissed with prejudice from the case.

on the vehicle or by checking the captured image and comparing either one to the number from the database displayed on the computer screen. In this case, the computer displayed the captured infrared image of Green's license plate, but it was unclear and Esparza could not read it. Additionally, the officers had someone in custody and therefore did not follow Green's car and visually confirm the match.

Instead, Esparza broadcast that Green's car was a stolen vehicle. ("David 14 David. Um, heading southbound on Mission from Cesar Chavez a 10-30 [stolen] vehicle, California 5 Sam Ocean William 750 just passing my camera car now. I have a custody. Just information for Ingleside if anybody wants to go get it.") He did not mention that he had not visually confirmed that the plate on Green's car was the same as the number from the database. Esparza asked the dispatcher to confirm that the plate from the database was listed as stolen. ("Is that a confirmed plate, Dispatch, or not? Because this is a camera car also, so I'm not sure. Confirm it.") The dispatcher broadcast that the plate was listed as belonging to a stolen GMC. ("Yeah, it is showing 10-30. This is a 1999 GMC, gray in color, with a plate of 5 Sam Ocean William 750.") Sergeant Kim was located a few blocks south on Mission when he heard Esparza's first broadcast about a stolen vehicle with plate number 5SOW750. Kim asked Esparza over the radio for a description of the car and Esparza stated that it was possibly a Lexus, dark in color, possibly burgundy.

Green drove past Kim in her burgundy Lexus and he saw the first few numbers of her license plate. He then followed her in his marked patrol car. Based on the information he heard from Esparza and the dispatcher, Kim decided to conduct a high-risk felony stop[2] of Green. Kim pulled behind Green's car at a red light and waited for back-up officers. Green did not commit any traffic violations or make any suspicious movements. During the time he was behind her car, Kim did not read the full plate number on Green's vehicle himself. He did not look for or notice any discrepancy between the number broadcast as stolen and Green's plate. Furthermore, he did not ask dispatch to confirm that Green's plate was stolen prior to effecting the stop.

---

[2] According to defendants, pursuant to the police department's protocol for conducting a high risk felony stop, officers draw their firearms, order the subject(s) out of the vehicle, contain and control the suspect, check the vehicle to verify it is clear of all occupants, and then continue the officers' investigation.

Kim signaled for Green to pull over and she complied.  At this point, the parties' versions of Green's detention include some disputed facts.  In particular, they disagree on the number of officers who pointed guns at Green and the length of her detention.  Kim does not remember how many additional officers participated in the stop, but there were at least two and up to six.  Green was ordered out of her car by one of the other officers.  Kim stood in the "V" of his car door and pointed his gun at Green.  Additional officers also pointed their guns at Green.  Green remembers seeing a shotgun pointed at her.  Kim holstered his gun and ordered Green to walk backwards toward his voice with her hands up.  After she was some distance from the car, Kim ordered her to get down on her knees.  Green had some physical difficulty complying, which Kim observed, but eventually she succeeded.  Kim then handcuffed Green's hands behind her back.  After other officers cleared her car, Kim ordered Green to stand up.  She was unable to do so unassisted and Kim had to grab her under the arm to pull her up.  After she was standing, she remained handcuffed while pat searched by another officer.

After Kim stopped Green's car, he asked the dispatcher to run the number 5SOW350.  Even then, he did not notice the discrepancy between Green's plate and the number Esparza had broadcast.  According to defendants, approximately three minutes passed before Kim learned that Green's plate matched her car and that it indeed was not stolen.  Kim then told other officers to remove the handcuffs from Green.  Thus, defendants suggest that Green was in handcuffs for about two minutes.  Green estimates that she was placed in handcuffs for about ten minutes and detained for between eighteen to twenty minutes.  Defendants do not estimate the total length of Green's detention.  They admit that she was not free to leave until the officers documented her detention and generated a "record of release" pursuant to California Penal Code section 849(c).

### III.  LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party must identify factual disputes that "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Irrelevant or unnecessary factual disputes do not raise any genuine issue for trial. *Id.* To preclude entry of summary judgment, the nonmoving party must present sufficient evidence such that a jury could return a verdict in his or her favor. *Id.*

IV. DISCUSSION

A. Fourth Amendment

An investigatory detention must be supported by reasonable suspicion of criminal activity. *See United States v. Orman*, 486 F.3d 1170, 1173 (9th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion requires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000). "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). In effectuating an investigatory detention consistent with the Fourth Amendment, officers may only utilize an amount of force that is objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 397 (1989).

In this case, Green argues that an unverified reading from an ALPRS does not create reasonable suspicion to justify a high risk stop at gunpoint. Defendants do not dispute the basic premise that an officer does not possess reasonable suspicion to detain the driver of a vehicle unless the ALPRS alert is confirmed. Thus, a significant issue in dispute is the effect of Kim's mistaken belief on the constitutionality of her seizure. Green also advances more general arguments regarding whether the use of guns and handcuffs under the circumstances of this case amounted to an arrest or a use of excessive force. In order to consider separately these distinct issues, the lawfulness of Green's detention must first be evaluated without regard to Kim's mistake, i.e., under the supposition that the ALPRS alert had been matched to Green's car.

Even if the facts were as Kim believed, Green contends that the tactics utilized by Kim and the other officers involved in the felony stop transformed her detention into a de facto arrest. If that were the case, Green's seizure would be unconstitutional, as defendants do not assert that an ALPRS alert provides probable cause for an arrest. *See Harper v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008) (observing that an arrest without probable cause is a Fourth Amendment violation). A determination of whether a seizure constitutes an investigatory stop or an arrest requires consideration of the totality of the circumstance. *See Washington*, 98 F.3d at 1185 (internal quotation marks and citations omitted). In this evaluation, a court considers both the intrusiveness of the methods used by the police as well as whether the officers involved had sufficient fear for their safety to justify their actions. *Id.*

If the circumstances were as Kim purportedly believed, then Green was suspected of driving a car with license plates taken from a stolen car. Aside from that, there are no allegations that Green broke any traffic laws or otherwise acted in a suspicious manner while Kim observed her driving. During execution of the felony stop, Green obeyed the officers' instructions and exhibited no threatening behavior. Moreover, no officer had specific information that she was armed or likely to resist. Under these facts, Green argues that the intrusiveness of the felony stop constitutes an illegal arrest.[3]

While Green disputes that she presented any immediate threat, the inference that a driver is dangerous arises from a reasonable suspicion that he or she is driving a stolen car or a car with stolen plates. In holding that an officer may routinely order occupants out of a car during an investigatory stop, the Ninth Circuit acknowledged the grave danger that officers face when confronting drivers and passengers in a vehicle. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1327 (9th Cir. 1995). In a later decision, the Court explained this holding as grounded in "the conclusion that '[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.'" *Bryan v. Macpherson*, 630 F.3d 805, 816 (9th Cir. 2010) (citing *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)). While neither

---

[3] Green raises these factual circumstances primarily with respect to her excessive force claim, but they are also relevant in considering whether she was subject to an investigatory stop or an arrest.

decision addresses a high risk felony stop, the circumstances presented in this case involve even greater potential danger, as the officers were seizing a person suspected of driving a car with stolen plates. In that situation, the tactics employed in a high risk felony stop do not necessarily transform an investigatory detention into a de facto arrest. Taking the version of events as recounted by Green, the particular manner in which the felony stop to which she was subjected was conducted also did not render her detention an arrest. Green estimates she was in handcuffs for up to ten minutes. During that time, Kim continued to investigate, which uncovered the fact that Green's license plate was not stolen and did not match the ALPRS number broadcast by Esparza. Although Green was not free to leave while the officers completed required paperwork, her detention lasted, at most, twenty minutes. Under the totality of the circumstances, including the crime the officers were investigating, the scope of Green's detention did not exceed the constitutional limits of an investigatory stop based on reasonable suspicion.

Having established that Green's detention was constitutional if Kim had reasonable suspicion to investigate her for driving with stolen plates, the next question is whether it did in fact exist. Since Kim failed to confirm that the license plate was stolen, Green contends that he possessed merely a "hunch" that her plates were stolen, which was insufficient to justify the stop. It is uncontested that the ALPRS system could misread, and therefore, mismatch license plates with numbers listed in its database. Thus, defendants do not dispute that an ALPRS alert does not automatically support a vehicle stop. Instead, the common practice of the department at the time of Green's seizure required verifying the information supplied by the system. First, an officer with access to the vehicle or the photograph taken by the camera would compare the number reported by the ALPRS as a "hit" with the actual license or the photograph of it. Second, the officer would "run the plate," or verify with dispatch that it was still of interest and why it was flagged. Based on that information, the officer would then determine how to proceed.

Kim contends that, based on the broadcasted information, he reasonably concluded that Esparza had made a visual confirmation between Green's plate and the ALPRS hit. As an initial matter, Kim is entitled to rely on information supplied by Esparza in determining whether reasonable suspicion exists. *See Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) ("Effective

and efficient law enforcement requires cooperation and division of labor to function. For that reason, law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers."). In fact, Esparza had not made the visual confirmation and Kim was mistaken in so concluding. A good faith, reasonable mistake of fact, however, does not undermine a finding of reasonable suspicion. *See United States v. Garcia-Acuna*, 175 F.3d 1143, 1147 (9th Cir. 1999) (providing that "[a] mistaken premise can furnish the grounds for a *Terry* stop," so long as the officers do not know their information is mistaken and reasonably act on it).

Although Green argues that Kim's failure to confirm the plate visually was unreasonable, Esparza never expressed any indication that he had not already done so. In his first broadcast, Esparza announces that his APLRS had picked up a reported stolen vehicle and, as he was involved with another suspect, someone else might want to "go get it." He then asks dispatch to confirm that the plate is stolen: "Is that a confirmed plate, Dispatch, or not? Because this is a camera car also, so I'm not sure. Confirm it." Thus, Esparza expresses uncertainty as to whether the plate is still listed as stolen. The dispatcher confirms that the license plate 5SOW750 belongs to a stolen, gray GMC. There is no indication that Esparza alerted anyone that he had not visually matched either Green's actual plate or the photograph of her plate with the number he asked dispatch to confirm as stolen. In particular, when Kim asked Esparza for a description of the vehicle, he described the car as possibly a Lexus, but did not communicate that the visual match of its license plate remained unconfirmed. Under these circumstances, Kim's belief that the plate broadcast as stolen by dispatch had already been matched by Esparza to Green's car was a good faith, reasonable mistake. With the reasonable belief that Green was driving a car with stolen plates, no reasonable jury could find that Kim lacked reasonable suspicion to conduct an investigatory stop. Therefore, defendants' motion for summary judgment on Green's Fourth Amendment claim against Kim is granted.[4]

On Green's final challenge, the manner in which the felony stop was conducted did not involve excessive force. Under the Fourth Amendment, in making an arrest or investigatory stop, the police necessarily have "the right to use some degree of physical coercion or threat thereof to

---

[4] Green raises five objections to portions of declarations submitted by defendants in support of their motion for summary judgment. Defendants also object to two exhibits offered by Green. As the Court granted defendants' motion and did not rely on the evidence to which Green objects, the objections are denied as moot.

effect it." *Graham*, 490 U.S. 386, 396 (1989). In determining whether the amount of force is objectively reasonable, a court considers the particular circumstances including the severity of the crime, the immediacy of the threat posed to officers or others, and whether a suspect is actively resisting arrest or attempting to flee. *Id.* Although Green argues that the officers had no specific information that she was armed, for the reasons stated above, where the driver is suspected of operating a car with stolen plates, the tactics involved in a felony stop may be objectively reasonable. In Green's recounting of the felony stop, she was ordered out of her vehicle while several officers pointed handguns and a shotgun at her. She had physical difficulty in complying with Kim's orders to get down on her knees, after which she was handcuffed. She continued to see guns pointed in her direction while the officers cleared her car. She had difficulty standing back up, prompting Kim to grab her under the arm to pull her up. Green estimates she was in handcuffs for up to ten minutes and detained for up to twenty. As these tactics were employed in conducting a lawful investigatory stop for suspicion of driving with stolen plates, no reasonable jury could find that Green was subjected to excessive force. Accordingly, the motion for summary judgment on the excessive force claim is granted.

In any event, Kim is entitled to qualified immunity for the alleged Fourth Amendment violations. Qualified immunity serves to shield a defendant from litigation and trial "only if the facts alleged and evidence submitted, resolved in [the plaintiff's] favor and viewed in the light most favorable to [her], show that [the defendant's] conduct did not violate a federal right; or, if it did, the scope of that right was not clearly established at the time." *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (citation omitted). In this case, Kim had reasonable suspicion to subject Green to the felony stop and, as executed, the seizure did not involve excessive force. Thus, Kim did not violate any federal right. Finally, Green also seeks to hold the City liable to the extent that Kim acted pursuant to a municipal policy. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). As Green has not identified a constitutional violation, the City's motion for summary judgment on the Fourth Amendment *Monell* claim also must be granted.

B. <u>State Law Claims</u>

Green brings several state law claims against Kim and the City. First, she contends that defendants violated California's Bane Act. That Act provides a private right of action for damages and injunctive relief where a person "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1. This claim again requires a showing that Green's detention was unlawful, which she has not made. Therefore, defendants' motion for summary judgment on the Bane Act claim also must be granted.

Green further seeks to hold defendants liable for IIED. The elements of this tort require: (1) extreme and outrageous conduct by the defendant performed with the intent to cause, or with reckless disregard of causing, emotional distress; (2) severe or extreme emotional distress suffered by the plaintiff; and (3) a causal link between plaintiff's emotional distress and defendant's outrageous conduct. *See KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1028 (1995). For behavior to constitute IIED, it must be "so extreme and outrageous as to go beyond all possible bonds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 499 n.5 (1970) (internal quotation marks and citation omitted). Although Green alleges that she suffers from severe emotional distress after being subjected to the felony stop, her detention was supported by reasonable suspicion and did not involve excessive force. As Kim's conduct was pursuant to a lawful investigatory stop, his actions do not constitute behavior that is "utterly intolerable" in a civilized society. Defendants' motion for summary judgment on the IIED claim is granted.

Green's final state law claims are for assault and negligence. As Kim acted with reasonable suspicion, he was privileged to detain Green using reasonable force. Cal. Penal Code § 835a; *see also Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1248 (2007) (granting summary judgment on battery claim pursuant to section 835a where force was not unreasonable). Moreover, the negligence claim also fails as a matter of law on the facts of this case as Kim's use of force was objectively reasonable. *See City of Simi Valley v. Superior Court*, 111 Cal. App. 4th 1077, 1083

(2003). Thus, defendants' motion for summary judgment on the assault and negligence claims also must be granted.

### V. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment on all claims is granted, and plaintiff's motions for partial summary judgment are denied.

IT IS SO ORDERED.

Dated: 9/23/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE