UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
DENISE GREEN, individually,      )
                                 )
           Plaintiff,            )
                                 )
      vs.                        ) No. C10-2649 RS
                                 )
CITY AND COUNTY OF SAN           )
FRANCISCO and the SAN            )
FRANCISCO POLICE DEPARTMENT,     )
public entities; SERGEANT        )
JA HAN KIM; OFFICER ESPARZA;     )
OFFICER PEDERS; and DOES 1-10,   )
individually,                    )
                                 )
           Defendants.           )
                                 )
```

DEPOSITION OF MICHAEL J. DEELY

Tuesday, July 12, 2011

JUDY BRENNAN
Certified Shorthand Reporter
25634 Clover Road
Hayward, California 94542
(510) 538-1939
FAX (510) 538-5949

REPORTED BY:  JUDY BRENNAN, CSR NO. 5138

Page 2

```
 1              I N D E X
 2    Examinations                    Page
 3    MR. HADDAD                         4
 4
 5              ---oOo---
 6
 7            E X H I B I T S
 8    No.     Description             Page
 9    1    3-page Notices of Depositions Duces Tecum    4
         of Officer Brown and "Persons Most
10       Knowledgeable" Pursuant to FRCivP
         30(b)(6)
11
      2    2-page 9-22-10 SFPD Department Bulletin    19
12       entitled Automated License Plate
         Recognition Vehicles(CCSF Green
13       000028-000029)
14    3    1-page PIPS Technology document entitled   38
         Database Hits (PIPS00792)
15
16
17              ---oOo---
18
19
20
21
22
23
24
25
```

Page 3

```
 1       BE IT REMEMBERED that pursuant to Notice of
 2    Taking Deposition, and on Tuesday, July 12, 2011,
 3    commencing at the hour of 11:06 a.m., at the Law Offices
 4    of HADDAD & SHERWIN, 505 - 17th Street, Third Floor,
 5    Oakland, California, before me, JUDY BRENNAN,
 6    a Certified Shorthand Reporter duly licensed by the State
 7    of California, there personally appeared
 8              MICHAEL J. DEELY,
 9    called as a witness by the Plaintiff herein, who, being
10    by me first duly sworn, was examined and interrogated as
11    is hereinafter set forth.
12
13              ---oOo---
14
15           A P P E A R A N C E S
16    For Plaintiff:   HADDAD & SHERWIN
                  BY: MICHAEL J. HADDAD, Esquire
17                    GINA ALTOMARE, Esquire
                  505 - 17th Street, Third Floor
18                Oakland, California 94612
                  (510) 452-5500
19
      For Defendants:  OFFICE OF THE CITY ATTORNEY
20                BY: JAMES F. HANNAWALT
                       Deputy City Attorney
21                1390 Market Street, Sixth Floor
                  San Francisco, California 94102
22                (415) 554-3800
23
24
25
```

Page 4

```
 1              MICHAEL J. DEELY,
 2    being first duly sworn by the Certified Shorthand
 3    Reporter to tell the truth, the whole truth and nothing
 4    but the truth, testified as follows:
 5
 6           EXAMINATION BY MR. HADDAD
 7         (Plaintiff's Exhibit 1 marked for
 8         identification.)
 9         MR. HADDAD: Q.  Hello.  Would you please state
10    your name for the record.
11      A.   Michael J. Deely.
12      Q.   How do you spell your last name?
13      A.   D-e-e-l-y.
14      Q.   Thanks.  You're a sergeant with the SFPD?
15      A.   Yes.
16      Q.   This is the deposition of the person most
17    knowledgeable on behalf of the San Francisco Police
18    Department concerning the SFPD's training, policies and
19    procedures regarding automated license plate recognition
20    vehicles from the three years prior to the incident to
21    the present.  Are you the person most knowledgeable as
22    I've just described?
23      A.   I believe so.
24      Q.   And you're here to testify as the person most
25    knowledgeable as I've just described, right?
```

Page 5

```
 1      A.   Yes.
 2         MR. HADDAD:  I've marked this deposition notice
 3    as Exhibit 1, just for the record.
 4      Q.   How many times have you been deposed before?
 5      A.   This is the first time.
 6      Q.   When did you start your law enforcement career?
 7      A.   April of '95.
 8      Q.   And have you worked for any other law
 9    enforcement agency besides San Francisco?
10      A.   No.
11      Q.   What academy did you go to?
12      A.   The last time I went, '79, San Francisco Police
13    Department.
14      Q.   Of course, that's POST certified, right?
15      A.   Correct.
16      Q.   Would you briefly take us through your
17    different ranks and assignments with the SFPD, please.
18      A.   I started with the police academy April '95,
19    graduated December of '95, did my field training at
20    Bayview Station.  From Bayview Station I was transferred
21    to my permanent assignment at Northern Police Station.
22    I spent approximately ten years there except for
23    temporary assignments at different units.  And I
24    promoted to sergeant in 2005, July of 2005.
25      Q.   Where were you assigned when you were promoted
```

Page 6

1  to sergeant?
2     A.   Northern Police Station.
3     Q.   And did your assignment change after that?
4     A.   Yes.
5     Q.   What did it change to?
6     A.   A supervisory position working midnights at
7  Tenderloin Police Station.
8     Q.   And then how long did you work at Tenderloin in
9  that capacity?
10    A.   Approximately ten months, until I had a knee
11 injury that put me off of work for approximately three
12 months, and then from returning to work in a light-duty
13 position at Gang Task Force until my knee healed in
14 January.
15    Q.   So how long was that at Gang Task Force?
16    A.   I want to say maybe two months --
17    Q.   Okay.
18    A.   -- at that stint.  And then I went to Ingleside
19 Police Station as a field supervisor, and I was there
20 for approximately seven months.
21    Q.   Then where?
22    A.   In July of '07, I believe, I was transferred
23 back to the Gang Task Force Unit.
24    Q.   For how long?
25    A.   That was the beginning of a three-year

Page 7

1  assignment at the Hall of Justice.  On paper I was a
2  Gang Task Force but I was tasked with a special
3  assignment in investigations.  So you can say that
4  assignment lasted until September of 2010.
5     Q.   And then where to?
6     A.   Central Police Station, where I currently work.
7     Q.   And what are your duties at the Central Police
8  Station now?
9     A.   I'm a patrol sergeant, field supervisor.
10    Q.   Have you ever had any professional contact with
11 Sergeant Kim?
12    A.   I know him by face.
13    Q.   Were you at Ingleside when he was there?
14    A.   No, I don't think so.
15    Q.   Have you been a training officer for anything
16 before?
17    A.   Yes.
18    Q.   What have you trained?
19    A.   I was a field training officer in, oh, 2003,
20 2004 and a field training officer supervisor at
21 Ingleside Police Station for seven months.
22    Q.   What did you do as a field training officer
23 supervisor?
24    A.   I oversaw the field training officers and their
25 recruits.

Page 8

1     Q.   Have you provided any other training to
2  officers besides field training?
3          MR. HANNAWALT:  Objection.  Vague.
4          MR. HADDAD:  Q.  Any particular area of
5  training.
6          MR. HANNAWALT:  Same objection.
7          Go ahead.
8          THE WITNESS:  I was in the process of, well,
9  helping to develop a training program for the ALPR
10 program, the automated license plate recognition
11 systems.
12         MR. HADDAD:  Q.  When did you do that?
13    A.   That process began in January of '08.
14    Q.   Are you still involved in that process?
15    A.   No.
16    Q.   When did your involvement with that process
17 end?
18    A.   September of 2010.
19    Q.   And at what stage was that process of
20 departmental ALPR training when you left in September of
21 '10?
22    A.   It was still a work in progress.
23    Q.   At any time between January 2008 and
24 September 2010 did the department have any systemic ALPR
25 training?

Page 9

1          MR. HANNAWALT:  Objection.  Vague as to the
2  term "systemic ALPR training."
3          MR. HADDAD:  Q.  Did the department have any
4  official ALPR training?
5     A.   No.
6          MR. HANNAWALT:  Objection.  Vague as to the
7  term "official ALPR training."
8          MR. HADDAD:  Q.  Did the department provide any
9  ALPR training at any time during the period I described,
10 January '08 until September '10?
11    A.   I, as a member of the department, provided
12 training, yes.
13    Q.   But you've explained that was not official
14 training, right?
15         MR. HANNAWALT:  Objection.  Vague as to the
16 term "official training."
17         MR. HADDAD:  Q.  You can answer unless you're
18 specifically instructed not to answer.
19    A.   Okay.  Can you repeat the --
20    Q.   You did provide some ALPR training, but you
21 also explained in an answer to a question that the
22 department did not have any official ALPR training.  So
23 can you explain what you mean by those two answers?
24         MR. HANNAWALT:  Objection.  Misstates
25 testimony, compound, vague.

Page 10

1  Go ahead.
2  THE WITNESS: My role, we did user training at
3  stations that were equipped with the ALPR cars.
4  Specific to the users identified or the operators in the
5  vehicles, we did roll call training, we -- at the
6  stations that were involved in the project. We did
7  impromptu training to officers interested in the systems
8  and how they worked.
9  MR. HADDAD: Q. When you say "we," who are you
10 referring to?
11 A. Officer Eric Batchelder, who worked for me at
12 the -- who still works in my past assignment, and
13 Officer Eric Perez, who also works for me.
14 Q. And this training that the three of you
15 provided, was that something that the police department
16 authorized and ordered you to do?
17 MR. HANNAWALT: Objection. Vague as to the
18 term "authorized and ordered." Compound.
19 Go ahead.
20 THE WITNESS: No.
21 MR. HADDAD: Q. Why did you provide the
22 training, then?
23 A. In order to introduce the systems to the
24 officers that were going to be using them, it was
25 important that they know how to turn the systems on,

Page 11

1  what they were going to be capable of and, more
2  importantly, what they were not capable of, and what
3  they could expect from us, from the vehicle.
4  Q. So you were basically showing the officers how
5  to use the new ALPR system, correct?
6  A. Yes.
7  Q. And during that time period did your department
8  have some official procedure for authorizing training?
9  MR. HANNAWALT: Objection. Vague.
10 THE WITNESS: Authorized training related to
11 the ALPR or --
12 MR. HADDAD: Q. Just training in general.
13 Like, for instance, did your department have some sort
14 of procedure to authorize specific training courses on
15 topics?
16 A. Yes, I believe so.
17 Q. And the ALPR training that you provided had not
18 gone through that official procedure to receive
19 departmental authorization; is that correct?
20 A. Yes.
21 Q. So the training you were providing was not part
22 of some sort of official training of the San Francisco
23 Police Department, correct?
24 A. Yes.
25 MR. HANNAWALT: Objection. Vague as to the

Page 12

1  term "official training."
2  MR. HADDAD: Q. Essentially you were filling
3  in the gaps to provide training that wasn't officially
4  provided at that time; is that right?
5  MR. HANNAWALT: Objection. Argumentative and
6  vague as to the term "official."
7  Go ahead.
8  MR. HADDAD: Q. You can answer. Let me
9  rephrase it.
10 From January of '08 until September '10 it was
11 obvious that if officers were to use the new ALPR
12 system, they had to have some training on it, right?
13 A. Yes.
14 Q. And if they were going to use it properly, they
15 had to have training, right?
16 A. Yes.
17 Q. So even though the department did not have an
18 official ALPR training program during that period, you
19 and a couple other supervisors took it upon yourselves
20 to provide some training about the ALPR system during
21 that time, right?
22 MR. HANNAWALT: Objection. Assumes facts not
23 in evidence.
24 Go ahead.
25 THE WITNESS: I was the only supervisor, along

Page 13

1  with Officers Batchelder and Perez, who worked for me.
2  MR. HADDAD: Q. And you were the ones who took
3  it upon yourselves to provide some ALPR training to
4  officers who were going to be using that system,
5  correct?
6  A. Yes.
7  Q. So can you -- let's back up a little bit. Can
8  you tell me how you first became involved with the ALPR
9  technology on behalf of the San Francisco Police
10 Department.
11 A. I believe it was late 2007 I was asked to
12 explore the possibility of getting equipment that we had
13 purchased installed on vehicles.
14 Q. And who asked you to do that?
15 A. Then Captain Kevin Cashman.
16 Q. Would you say his last name slowly.
17 A. Cashman.
18 Q. Thank you. So what did you do in that
19 capacity?
20 A. Found the equipment, read the paperwork related
21 to the equipment, made several phone calls to the vendor
22 and -- to get myself familiar with what we had purchased
23 and how it was to be used.
24 Q. So the vendor for that ALPR equipment was a
25 company called PIPS, P-I-P-S, Technology, right?

Page 14

1  A.  Correct.
2  Q.  And when you first began looking into this, the
3  situation was that the police department had purchased
4  some ALPR equipment from the PIPS Company but that it
5  was not installed on the cars yet, correct?
6  A.  Yes.
7  Q.  And apparently the police department had not
8  contracted with the PIPS Technology Company to actually
9  do the installation, right?
10  A.  It was part of the purchase agreement, I
11  believe, but PIPS used an outside vendor to do the
12  actual installs.
13  Q.  Oh, okay.  Was there any problem with that?
14     MR. HANNAWALT:  Objection.  Vague.
15     THE WITNESS:  With the first install I think a
16  company called Day Wireless did it, and the install was
17  less than professional.
18     MR. HADDAD:  Q.  They messed up one of the
19  cars, right?
20  A.  They -- their installation was not pretty.  I
21  mean, they did a hack job.
22  Q.  So what was your involvement, if any, with
23  installations?
24  A.  I was an observer on the first installation and
25  the second installation.

Page 15

1  Q.  And what was the plan for the police department
2  with the ALPR technology during the period that the
3  first cars were having the system installed?
4     MR. HANNAWALT:  Objection.  Vague.
5     THE WITNESS:  The plan was to see if they were
6  compatible with the existing equipment in the police
7  cars.
8     MR. HADDAD:  Q.  That being the in-car
9  computers?
10  A.  Yes.
11  Q.  And was the ALPR system compatible with the
12  existing computer equipment?
13  A.  Yes.
14  Q.  Was there anybody else that was working with
15  you to implement the ALPR system in the SFPD?
16  A.  No.
17  Q.  This was pretty much your responsibility?
18  A.  (Nods.)
19  Q.  Yes?
20  A.  Yes.
21  Q.  So what else did you do besides supervising
22  some of the installations?
23  A.  In my day-to-day --
24  Q.  In connection with the ALPR systems what else
25  did you do?

Page 16

1  A.  Supervising installations, trying to get the --
2  the rest of the equipment scheduled for installation,
3  trying to get our IT department to provide some service
4  to work on connectivity between the vehicles and the
5  back office system server that we had purchased, seeking
6  out best practices from available sources, attending
7  seminars, and talking to other agencies that had the
8  systems in place.
9  Q.  Tell me what you did to seek out best practices
10  for law enforcement use of an ALPR system?
11  A.  Initially Google searches, then spoke to the
12  vendor, vendor salespeople, spoke to the IT people at
13  our Northern California HIDTA, spoke to individuals at
14  the Oakland PD who had the systems installed, sought out
15  best practices from the International Association of
16  Chiefs of Police regarding LPR.  That's about it.
17  Q.  Okay.  So at some point the International
18  Association of Chiefs of Police actually released a
19  model policy for ALPR.  Do you recall that?
20  A.  It was a policy -- a privacy paper.  It was not
21  necessarily a usage paper.  But I think it was -- it's
22  been several years since I've read it, but it was
23  more -- I don't think they have yet to release the usage
24  paper.  But the initial paper they released was a
25  90-page document related to privacy.

Page 17

1  Q.  When was that?
2  A.  I would say late '09, early 2010.
3  Q.  So as you sit here today, you're not aware of a
4  model usage policy for ALPR produced by the
5  International Association of Chiefs of Police?
6  A.  I sought it out a month ago and it's still not
7  available.  At that month ago it was not on their
8  website.  Whether it's been written or not, I don't
9  know.
10  Q.  Did the PIPS Company provide you with
11  information from other departments about their use of
12  ALPR systems and their policies?
13  A.  I sought out the Los Angeles Police Department
14  policy, but they were reluctant to release it.
15  Q.  Did they release it to San Francisco?
16  A.  No.
17  Q.  Did they ever say why?
18  A.  No.
19  Q.  San Francisco Police policies are generally
20  publicly available, right?
21  A.  (Nods.)
22  Q.  Yeah?
23  A.  Yes.
24  Q.  Apparently that's not true of the Los Angeles
25  Police Department?

7/12/2011               DEPOSITION OF MICHAEL J. BROWN

Page 18

1    A.   I do not know, but the initial searches and
2  queries through the vendor to LAPD was -- the response
3  was vague and, the best of my recollection, it was still
4  a work in progress.
5    Q.   Why were you trying to inquire about best
6  practices for the ALPR system?
7    A.   In order to write a clear, concise, easy-to-use
8  policy for members.
9    Q.   For the San Francisco Police Department
10 members, right?
11   A.   Right.
12   Q.   Had San Francisco ever had a written policy
13 about ALPR usage?
14   A.   Not while I was assigned to that unit.
15   Q.   As the person most knowledgeable concerning
16 ALPR in San Francisco, do you know whether even to this
17 date your department has a written policy for the use of
18 the ALPR system?
19   A.   There is one.
20   Q.   When was that written?
21   A.   I believe it was September 2010.
22   Q.   Do you know if that policy was written in
23 response to this lawsuit?
24   A.   I do not know that.
25        MR. HADDAD:  Please mark this.

Page 19

1        (Plaintiff's Exhibit 2 marked for
2         identification.)
3        MR. HADDAD:  Q.  I've just marked a policy as
4  Exhibit 2.  Is this the SFPD policy on ALPR you're
5  talking about?
6    A.   Yes.
7    Q.   And as far as you know, is that the only ALPR
8  written policy your department has ever had?
9    A.   Yes.
10   Q.   Were you involved in drafting this?
11   A.   No.
12   Q.   Do you know who drafted it?
13   A.   I believe it was a combination of Officer Eric
14 Batchelder and someone from our Legal Division, I'm
15 sure.
16   Q.   But even before this written policy was
17 distributed by your department, which is Exhibit 2, you
18 and a couple other officers did provide some training
19 about the ALPR system to officers who were going to be
20 using it; is that right?
21   A.   Yes.
22   Q.   Would you take a look at the fourth paragraph
23 of Exhibit 2 which is in bold.
24   A.   Yes.
25   Q.   Would you just review that for a minute.

Page 20

1    A.   Yes.
2    Q.   Is that bold paragraph from Exhibit 2
3  consistent with the training that you provided officers
4  in the San Francisco Police Department starting in
5  January 2008?
6    A.   Yes.
7    Q.   What is an electronic hot sheet?
8    A.   Well, an electronic hot sheet would be the
9  database Excel file with a list of stolen vehicles and
10 wanted vehicles.
11   Q.   Police have used hot sheets, whether electronic
12 or otherwise, in their work for many years; is that
13 right?
14   A.   Yes.
15   Q.   What is a hot sheet?  How is a hot sheet
16 generally used by police?
17   A.   At the beginning of each shift an officer will
18 print out a hot sheet and, upon entering their vehicle,
19 a common practice would be to scotch tape it to your
20 dashboard.
21   Q.   And how would an officer commonly use a hot
22 sheet on patrol?
23   A.   While on patrol they would observe license
24 plates, compare it to the license plates on the hot
25 sheet to see if they were listed.

Page 21

1    Q.   And according to SFPD procedures and training
2  for hot sheets generally, what was an officer supposed
3  to do if he or she found a match between a license plate
4  and the hot sheet?
5    A.   Confirm it with Dispatch prior to taking
6  action.
7    Q.   And what do you mean, confirm it with Dispatch?
8    A.   You broadcast the license plate of the observed
9  vehicle to the dispatch center, and they would run the
10 plate in their computer database to see if it was, in
11 fact, reported stolen and if there was any hit on the
12 vehicle license plate.
13   Q.   So simply having a visual match between a
14 license plate on a street and a number on a hot sheet
15 was not sufficient in and of itself to do a felony stop
16 on a car; you had to get confirmation from Dispatch,
17 right?
18        MR. HANNAWALT:  Objection.  Calls for a legal
19 conclusion, beyond the scope of the witness's
20 designation.
21        Go ahead.  You can answer.
22        THE WITNESS:  You would normally confirm.
23        MR. HADDAD:  Q.  You would normally confirm
24 because that was the policy and procedure of your
25 department, right?

7/12/2011              DEPOSITION OF MICHAEL J. BROWN

Page 22

```
 1     A.   Yes.
 2         MR. HANNAWALT: Same objection.
 3         MR. HADDAD: Q.  And that was to protect
 4   against the risk of conducting a felony stop of a car
 5   that wasn't actually stolen, right?
 6         MR. HANNAWALT: Objection. Vague, incomplete
 7   hypothetical.
 8         Go ahead.
 9         THE WITNESS: That would be part of it, yes.
10         MR. HADDAD: Q.  Because your department
11   understood that it's important to avoid conducting
12   felony stops of cars that are not legitimately believed
13   to be stolen, correct?
14     A.   I do not know the beginnings of that policy,
15   no.
16     Q.   Well, as a supervising sergeant who
17   supervised -- strike that.  You've supervised a lot of
18   felony stops as a sergeant; haven't you?
19     A.   Yes.
20     Q.   And based on your experience and training in
21   the department, is it important to avoid conducting
22   felony stops at gunpoint of cars that are not
23   legitimately believed to be stolen?
24         MR. HANNAWALT: Objection. Argumentative.
25         MR. HADDAD: Q.  Why is that important?
```

Page 23

```
 1     A.   Felony stops are high-risk endeavors.
 2     Q.   They're high risk for the officers involved,
 3   right?
 4     A.   For everybody involved.
 5     Q.   And also for the occupant of the car, right?
 6     A.   For everybody involved.
 7     Q.   Because it involves holding people at gunpoint,
 8   right?
 9     A.   It can, yes.
10     Q.   Every year around the country you hear about
11   situations where officers accidentally tragically but
12   mistakenly pull the trigger when they're pointing their
13   gun at someone when they don't mean to, right?
14     A.   No.
15         MR. HANNAWALT: Objection. Argumentative,
16   beyond the scope of this designation.
17         MR. HADDAD: Q.  You don't hear about that?
18         MR. HANNAWALT: Argumentative.  Beyond the
19   scope of this designation.
20         THE WITNESS: You said every year.  I've not
21   read one in several years.
22         MR. HADDAD: Q.  You've heard about that
23   happening before; haven't you?
24     A.   It has happened in the past.
25         MR. HANNAWALT: Same objections.
```

Page 24

```
 1   Argumentative, beyond the scope of this designation.
 2         MR. HADDAD: Q.  Now, how did you provide the
 3   training that you and the other two officers did provide
 4   to officers who would be using the ALPR system?
 5     A.   Common practice would be to take everyone
 6   involved out to the vehicle, show them the startup
 7   process in the vehicle and take them for a ride, show
 8   them the license plate capturing, what it looked like on
 9   the screen, what they could expect to see, what they
10   wouldn't see, and a way to determine whether the system
11   was functional or turned on.
12     Q.   And you taught them about what they should do
13   when they get a hit with the ALPR system?
14     A.   Always stressed to confirm the hit.
15     Q.   When you say confirm, do you mean visually
16   confirm that the license plate on the car is the same as
17   the license plate that comes up on the ALPR computer
18   screen?
19     A.   That would be part of the process, yes.
20     Q.   And what would the rest of the process be to
21   confirm the hit?
22     A.   Let Dispatch know what you were looking at.
23     Q.   Anything else?
24     A.   That would be the start and finish of the
25   confirmation, yes.
```

Page 25

```
 1     Q.   So an ALPR hit is not confirmed until it's
 2   confirmed through Dispatch and also confirmed visually
 3   that the plate on the wanted car is the same as the
 4   plate that came up on the ALPR system, right?
 5     A.   Yes.
 6         MR. HADDAD: I just need a quick break, please.
 7         (Recess.)
 8         MR. HADDAD: Q.  There's a part of this bold
 9   paragraph of Exhibit 2 that's also italicized.  I think
10   it's the third sentence.  And it says, quote, An ALPR
11   vehicle alert does not automatically provide ALPR users
12   sufficient justification to pull over or detain the
13   vehicle occupants, unquote.
14         Has that always been your understanding of the
15   ALPR system with SFPD?
16     A.   Yes.
17     Q.   And that's something that you trained the
18   officers in concerning the ALPR system?
19     A.   Yes.
20     Q.   And did you make sure that officers who were
21   going to be using that system understand that point?
22     A.   That was my -- my goal, yes.
23     Q.   Now, it takes a team to execute a felony stop
24   using an ALPR system; doesn't it?
25         MR. HANNAWALT: Objection. Lacks foundation.
```

Page 26

1  incomplete hypothetical, assumes facts not in evidence.
2       Go ahead.
3       MR. HADDAD: Q. It takes more than one
4  officer; doesn't it?
5       MR. HANNAWALT: Objection.
6       THE WITNESS: Yeah.
7       MR. HADDAD: Q. Theoretically there could be
8  one officer operating an ALPR car.
9    A.  Or any car.
10   Q.  Or any car. But one officer -- strike that.
11       At least one officer has to be in the ALPR car
12 to observe the hit, right?
13   A.  Yes.
14   Q.  And generally more than one officer executes a
15 felony stop, correct?
16   A.  Generally, yes.
17   Q.  That's the -- that's the preferred procedure,
18 to have backup officers involved, right?
19   A.  The more the better.
20   Q.  Yeah. Did you provide any training to officers
21 beyond those who were going to be directly using the
22 ALPR camera system about how to conduct felony stops
23 when it begins with an ALPR hit?
24   A.  No.
25   Q.  You mentioned that you did provide some lineup

Page 27

1  training; is that right?
2    A.  Yes.
3    Q.  And that would have included some training
4  about what the ALPR system was to officers who would be
5  in the field who might be involved in high-risk stops,
6  right?
7    A.  No.
8    Q.  Was your lineup training limited -- strike
9  that.
10       Who was your lineup training given to?
11   A.  Anyone worth starting that shift that day. It
12 was never specific to how they would conduct a felony
13 stop related to an LPR stop. A felony hit, whether it
14 be on a hot sheet or on the LPR, is a felony hit.
15   Q.  Okay.
16   A.  And they're here to proceed based on their
17 training and experience.
18   Q.  So officers already had received extensive
19 training about how to do a felony stop based on a hit
20 from a hot sheet, right?
21   A.  Yes.
22   Q.  And officers had been extensively trained that
23 it's necessary to confirm the hit on the hot sheet
24 before doing a felony stop, right?
25       MR. HANNAWALT: Objection. Beyond the scope of

Page 28

1  this designation.
2       Go ahead.
3       THE WITNESS: They have been trained. I don't
4  know if I'd used the word "extensive."
5       MR. HADDAD: Q. It's training that the SFPD
6  expects its officers to have had, correct?
7    A.  Yes.
8       MR. HANNAWALT: Same objection.
9       MR. HADDAD: Q. And to follow, right?
10   A.  Yes.
11      MR. HANNAWALT: Objection.
12      MR. HADDAD: Q. When you provided lineup
13 training, did you explain that the ALPR system is akin
14 to an electronic hot sheet?
15   A.  Yes.
16   Q.  The last sentence of the bold paragraph from
17 Exhibit 2 says, "Officers must use discretion and in
18 some cases have independent information to justify a
19 traffic stop." Was that also your understanding?
20   A.  I'm not sure what they mean by "have
21 independent information to justify a traffic stop." And
22 I'm not sure what they mean by "discretion."
23   Q.  Okay.
24   A.  So no.
25   Q.  Based on your history in the department as a

Page 29

1  supervising sergeant, your experience in the field, you
2  understood that officers need at least reasonable
3  suspicion to do any traffic pullover, right?
4    A.  Yes.
5    Q.  And to do a high-risk pullover what level of
6  suspicion or cause do officers need?
7       MR. HANNAWALT: Objection. Calls for a legal
8  conclusion, beyond the scope of this designation.
9       MR. HADDAD: It's based on your training and
10 experience, not your legal knowledge.
11      MR. HANNAWALT: Same objection.
12      Go ahead.
13      THE WITNESS: Once again, reasonable suspicion
14 is based on facts you have or you believe that you have
15 at the time.
16      MR. HADDAD: Q. So based on your experience
17 and training, officers in the San Francisco Police
18 Department were allowed to do felony stops of vehicles
19 based upon reasonable suspicion; is that right?
20      MR. HANNAWALT: Objection. Beyond the scope of
21 this designation.
22      Go ahead.
23      THE WITNESS: Yes.
24      MR. HADDAD: Q. Okay. And you understood that
25 in order to have reasonable suspicion an officer has to

Page 30

1  have particularized facts leading to that reasonable
2  suspicion, right?
3     A.  Yes.
4        MR. HANNAWALT:  Same objection.
5        MR. HADDAD:  Q.  And an unconfirmed ALPR hit
6  does not create reasonable suspicion to do a felony stop
7  of a vehicle; isn't that right?
8        MR. HANNAWALT:  Objection.  Calls for a legal
9  conclusion, beyond the scope of this designation.
10       Go ahead.
11       THE WITNESS:  Can you repeat that?
12       MR. HADDAD:  Q.  Yeah.  Based on your
13 experience and training with the SFPD, an unconfirmed
14 ALPR hit does not give an officer reasonable suspicion
15 to conduct a felony stop of a vehicle, correct?
16    A.  Correct.
17       MR. HANNAWALT:  Objection.  Calls for a legal
18 conclusion, beyond the scope of this designation.
19       MR. HADDAD:  Q.  What was your answer again?
20    A.  Correct.
21       MR. HADDAD:  Thank you.
22       MR. HANNAWALT:  Same objections.
23       MR. HADDAD:  Q.  Do you know Officer Esparza
24 from the -- I'm not sure which --
25    A.  He's in the Public Affairs office now.

Page 31

1     Q.  That's right.  I think he used to work at
2  Ingleside or Mission.
3     A.  He worked at Mission Station.
4     Q.  Did you know him then?
5     A.  I knew of him.
6     Q.  Did you provide ALPR training to officers in
7  the Mission Station?
8     A.  Yes.
9     Q.  Do you recall providing ALPR training to
10 Officer Esparza?
11    A.  No.
12    Q.  Is it possible you did but you don't remember?
13    A.  I probably did not provide Officer Esparza this
14 training.
15    Q.  Is there another officer you think was more
16 likely to have provided him that training?
17    A.  No.
18    Q.  So did Officer Esparza ever receive any
19 training about how to use the ALPR system?
20       MR. HANNAWALT:  Objection.  Calls for
21 speculation, lacks foundation.
22       Go ahead.
23       THE WITNESS:  I don't know.
24       MR. HADDAD:  Q.  And why is it that you believe
25 you probably did not provide him training?

Page 32

1     A.  I believe that Officer Esparza worked the swing
2  shift, which started at 4:00 o'clock.
3     Q.  M-hm.
4     A.  Most of my involvement was during the early
5  day, early hours of each business day.
6     Q.  And do you know what station Sergeant Jahan Kim
7  worked at in March 2009?
8     A.  Well, I'm assuming by this he worked in
9  Ingleside Station.
10    Q.  Did you provide training to Ingleside officers
11 around or before that time?
12    A.  Yes.
13    Q.  Do you know whether you provided any training
14 about the ALPR system to Sergeant Kim?
15    A.  I do not know.
16    Q.  Is it possible he would have been at one or
17 more of the lineups where you provided ALPR training?
18       MR. HANNAWALT:  Objection.  Calls for
19 speculation.
20       THE WITNESS:  I'm guessing that Sergeant Kim
21 worked midnights, which starts at 9:00 p.m., so I doubt
22 very much that I would have seen him in the course of my
23 duties.
24       MR. HADDAD:  Q.  Okay.  What shifts did you
25 provide training about ALPR to?

Page 33

1     A.  Normally day watch.
2     Q.  And the department did not have any requirement
3  that officers receive any ALPR training at that time,
4  correct?
5     A.  Correct.
6     Q.  And there is no systematic departmental-wide
7  ALPR training program to make sure that officers on each
8  shift would receive ALPR training, correct?
9     A.  Correct.
10    Q.  So there would have been no departmental
11 requirement that Officer Kim receive any ALPR training,
12 correct?
13    A.  At the time, yes.
14    Q.  And at the time of the Green incident there
15 were no written departmental policies and procedures
16 concerning usage of the ALPR system, right?
17    A.  What was it?  March of --
18    Q.  March of '09.
19    A.  '09.  I believe you're correct.
20    Q.  To your knowledge, even to this date does the
21 San Francisco Police Department have any official formal
22 training program for the ALPR system?
23       MR. HANNAWALT:  Objection.  Vague as to the
24 term "official formal training."
25       THE WITNESS:  Not that I know of.

Page 34

1  MR. HADDAD: Q. To the extent that officers
2  receive any training on ALPR even to this date, it is
3  training that a sergeant or an officer voluntarily
4  undertakes to provide another officer, correct?
5      A.   Can you repeat that?
6      Q.   M-hm. To the extent that an officer receives
7  any ALPR training even to this date by your department,
8  it's to the extent that some supervisor or other officer
9  voluntarily provides that training.
10     A.   Yes.
11     Q.   Have you made any recommendations to your
12 department at any time that your department should
13 provide a formal training program for officers
14 concerning the ALPR system?
15     A.   No.
16     Q.   Do you know whether anyone has?
17     A.   Now, you said provide formal training.
18     Q.   Yeah.
19     A.   I did recommend a written policy.
20     Q.   Okay. When was that?
21     A.   Back around the time of the first installation,
22 I believe.
23     Q.   Was that in 2007 or 2008?
24     A.   I don't think the first install was done until
25 early '08, maybe Spring of '08.

Page 35

1      Q.   So sometime around, say, early to mid '08 you
2  told your policy -- your department that they needed to
3  have a written policy concerning usage of the ALPR
4  system; is that right?
5           MR. HANNAWALT: Objection. Misstates
6  testimony.
7           Go ahead.
8           THE WITNESS: I stated that we needed a written
9  policy.
10          MR. HADDAD: Q. Okay. Who did you tell that
11 to?
12     A.   I believe Captain David Lazar, who was the
13 captain of investigations at the time and my supervisor.
14     Q.   David Lazar?
15     A.   L-a-z-a-r, I believe.
16     Q.   Thank you. Do you know whether you told
17 anybody else?
18     A.   Not specifically, no.
19     Q.   What was Lieutenant Lazar's response to that
20 from you?
21     A.   Captain Lazar. He acknowledged that it needed
22 to be done, I believe. I don't remember.
23     Q.   Did he ever provide you with any follow-up
24 information about whether he had passed that on to
25 higher-ups?

Page 36

1      A.   No.
2      Q.   Was it obvious to you that officers needed
3  training on this new ALPR system?
4           MR. HANNAWALT: Objection. Argumentative,
5  vague.
6           Go ahead.
7           THE WITNESS: It was obvious that training
8  needed to take place in order to use the equipment.
9           MR. HADDAD: Q. To use it properly, right?
10     A.   Correct.
11     Q.   And safely, right?
12     A.   Correct.
13     Q.   Did you tell Captain Lazar anything specific
14 that you thought should be included in a written ALPR
15 policy in early to mid 2008?
16     A.   No.
17     Q.   Did you offer to help create such a policy?
18     A.   No.
19     Q.   Do you know whether any training was provided
20 by the PIPS Company about the ALPR technology?
21          MR. HANNAWALT: Objection. Vague.
22          THE WITNESS: They provided me with training
23 regarding the back office systems software
24 functionality, the installation, the software
25 installation. They were in the process of developing

Page 37

1  more training, I think.
2           MR. HADDAD: Q. Do you know whether or not the
3  PIPS Company ever provided training to officers who were
4  going to be using the ALPR system?
5      A.   Once.
6      Q.   Can you tell me what that entailed?
7      A.   I think the training -- the IT person that they
8  sent out, his name is Jock Livorius, I believe, while he
9  was fine-tuning the first installation, provided myself
10 and two other officers with hands-on training on how to
11 start the system, how to operate the system, how to shut
12 it down.
13     Q.   His name is Jock Liver?
14     A.   L-i-v- -- I think you'll find him in many of
15 the e-mails. L-i-v-o-r-i-u-s maybe, Livorius.
16     Q.   And you're just talking about training he
17 provided to you and two other officers, right?
18     A.   Yes.
19     Q.   Do you know whether the PIPS Company ever
20 provided training to larger groups of San Francisco
21 officers who would be using their equipment?
22     A.   I do not know if they did or not.
23     Q.   Do you know whether the PIPS Company offered
24 such training?
25     A.   No.

10 (Pages 34 to 37)

Page 38

1    Q.   What have you reviewed in preparation for the
2   deposition today?
3    A.   The 800 pages of documents right there.
4    Q.   From the PIPS Company, right?
5    A.   Yeah.
6    Q.   Did you review the policy we've marked as
7   Exhibit 2?
8    A.   Oh, yes.
9    Q.   Anything else?
10   A.   No.
11       MR. HADDAD:  Would you mark this, please.
12          (Plaintiff's Exhibit 3 marked for
13           identification.)
14       MR. HADDAD:  Q.  I'm handing you a page from
15   the PIPS documents to which you were referring.  And did
16   you notice that in those 800 pages or so there were a
17   couple copies of what appeared to be something like a
18   Power Point presentation concerning the use of the ALPR
19   system?
20   A.   I'm not -- I don't recall them being Power
21   Points but --
22   Q.   Take a look at what we just marked as
23   Exhibit 3.
24   A.   M-hm.
25   Q.   Do you remember seeing this page in there

Page 39

1   (indicating)?
2    A.   Yes.
3    Q.   Had you seen this before just reviewing these
4   documents for your deposition?
5    A.   No.
6    Q.   The subpoena to the PIPS Company requested all
7   of their documents, including documents that they
8   provided to the San Francisco Police Department,
9   concerning their ALPR system.  Do you know whether the
10  San Francisco Police Department ever received Exhibit 3?
11   A.   This is, from what I can ascertain from
12  looking, part of their BOSS 3.0 system, which we only
13  just bought, I believe, in September of 2010.  And we
14  prior to that had BOSS 2.5 which had a different screen,
15  different look, different feel than what they now are
16  using.
17   Q.   All right.  Well, you see that there's two
18  bullet points listed on this page.  And the first one
19  says, quote, Upon a reported database match, always
20  verify the accuracy of the plate read, unquote.
21       And has that always been your understanding
22  about using any of the different ALPR systems provided
23  by the PIPS Company?
24   A.   Yes.
25   Q.   And did PIPS Company representatives say

Page 40

1   something along those lines to you in the training that
2   they provided you?
3    A.   No.
4    Q.   And the next bullet point says, Follow your
5   Agency SOP's regarding appropriate intervention,
6   unquote.  And by SOP's, do you understand that to mean
7   standard operating procedures?
8    A.   Yes.
9    Q.   Now, the first time your department got written
10  standard operating procedures for the ALPR system was on
11  September 22nd, 2010, Exhibit 2, right?
12   A.   Yes.
13   Q.   But before that your department had some
14  unwritten procedures and training concerning hot sheets
15  generally, right?
16   A.   Yes.
17   Q.   Have you looked into the incident involving my
18  client, Denise Green, at all?
19       MR. HANNAWALT:  Objection.  Vague.  And I'll
20  object to any attorney-client privileged communications.
21       MR. HADDAD:  Q.  That's right.  Excluding what
22  you might have learned from an attorney.
23   A.   No.  Correction.  I did read the CAD and the
24  police report.
25   Q.   Have you had any conversations with any other

Page 41

1   member of your police department without an attorney
2   present concerning the Denise Green incident?
3    A.   Yes.
4    Q.   Who did you talk to?
5    A.   Eric Batchelder.
6    Q.   When was that?
7    A.   Sometime in 2009.
8    Q.   And what did you discuss with Officer
9   Batchelder?
10   A.   The traffic stop.
11   Q.   Why did you talk about it with him?
12   A.   Because it came to our attention that Officer
13  Esparza was the subject of some issue regarding a
14  traffic stop.
15   Q.   And did you learn that Sergeant Kim was also
16  involved?
17   A.   Only through the police report.
18   Q.   Are you critical of any officer's conduct in
19  the Green incident?
20       MR. HANNAWALT:  Objection.  Beyond the scope of
21  this designation, vague.  I'm going to instruct him not
22  to answer that question.  It's inappropriate.
23       Go ahead.  Next question.
24       ==MR. HADDAD:  Q.  Did you or Officer Batchelder==
25  ==have any ideas about any training or action by your==

Page 42

1  department that should be done to prevent another
2  occurrence from happening that was like the Green
3  occurrence?
4       MR. HANNAWALT: Objection. Vague, compound,
5  calls for a narrative.
6       Go ahead. If you can understand it, you can
7  answer it.
8       THE WITNESS: I think the only thing that
9  needed to be stressed related to that was the
10 verification of the license plate.
11      MR. HADDAD: Q. And by verification, you mean
12 visually verifying that the plate on the car matched the
13 number that came up on the ALPR computer screen?
14   A.   Yes.
15   Q.   And whose responsibility is that?
16   A.   The operator who made the observation, the
17 initial observation.
18   Q.   And what if the operator making the initial
19 observation isn't in a position to visually confirm the
20 license plate? Is another officer supposed to do it, if
21 possible?
22      MR. HANNAWALT: Objection. Calls for
23 speculation, incomplete hypothetical.
24      Go ahead.
25      THE WITNESS: In a perfect world, yes.

Page 43

1       MR. HADDAD: Q. If the officer in the ALPR car
2  is not in a position to visually confirm the license
3  plate itself, then some other officer should make that
4  visual confirmation before executing a felony stop,
5  correct?
6       MR. HANNAWALT: Objection. Argumentative,
7  assumes facts not in evidence, incomplete hypothetical.
8  That's it.
9       Go ahead.
10      THE WITNESS: Yes.
11      MR. HADDAD: Q. Have you done any systematic
12 investigation of the Green incident?
13   A.   No.
14   Q.   Have you made any recommendations to your
15 department as a result of what you have learned about
16 the Green incident?
17   A.   No.
18   Q.   Do you intend to?
19   A.   No.
20      MR. HANNAWALT: Objection. Vague, beyond the
21 scope of this designation.
22      MR. HADDAD: Let's take one more short break
23 and then we'll wrap this up.
24      (Recess.)
25      MR. HADDAD: Q. Did the PIPS Company ever

Page 44

1  provide any user manuals with the system that was in use
2  as of March 2009?
3    A.   User manual. There was maybe a multi-page
4  handout I think, as I remember, and a laminated one-page
5  checklist.
6    Q.   And what did those documents describe?
7    A.   Startup procedures, the updating of the hot
8  sheet, end shift procedures. I think that was about it.
9    Q.   Did they talk about the importance of visually
10 confirming an ALPR hit before taking action?
11   A.   No, not to my knowledge.
12   Q.   In the PIPS documents you reviewed do you
13 recall seeing a number of times some sales documents
14 which talked about that the ALPR system is able to
15 correctly interpret a license plate 92 percent of the
16 time?
17      MR. HANNAWALT: Counsel, if you're referring to
18 a specific document like the one you have in front of
19 you, could we have the page number?
20      MR. HADDAD: I don't think these are Bates
21 numbered, but I'll just show you --
22      MS. ALTOMARE: Yeah, they're Bates numbered.
23 Right there (indicating).
24      MR. HADDAD: Q. PIPS document 31, for
25 instance.

Page 45

1    A.   Ninety-two percent sounds about right.
2    Q.   And you can see what I'm talking about. It's
3  bullet point number 4 on page 31.
4    A.   Okay.
5    Q.   And the PIPS Company represents that as of
6  2006, December, its ALPR system was accurate in
7  interpreting license plates 92 percent of the time,
8  right?
9       MR. HANNAWALT: I'll object to that. I mean,
10 the statement speaks for itself. It says that it passed
11 a rigorous five-day protocol in night testing -- day and
12 night testing procedure by CHP with successful capture
13 and plate interpretation rates of 92 percent obtained at
14 speeds of up to 110 miles per hour in various conditions
15 that simulate the mobile law enforcement environment.
16 It doesn't say anything about guarantees or anything
17 else. So that's what the document says.
18      MR. HADDAD: Would you read my question back.
19      (Record read as follows:
20      "Q. And the PIPS Company represents
21      that as of 2006, December, its ALPR
22      system was accurate in interpreting
23      license plates 92 percent of the
24      time, right?")
25      MR. HANNAWALT: Same objection.

7/12/2011          DEPOSITION OF MICHAEL J. BROWN

```
                                    Page 46
 1       MR. HADDAD:  Q.  Go ahead.
 2       A.   Yes.
 3       Q.   And that's consistent with your experience with
 4   the ALPR system, right?
 5       A.   Give or take a few percent, yeah.
 6       Q.   Okay.  And so would it be accurate to say that
 7   eight percent of the time, give or take a point or two,
 8   the PIPS system misreads a license plate -- excuse me,
 9   the ALPR system misreads a license plate?
10       MR. HANNAWALT:  Objection.  Argumentative and
11   beyond the scope of this designation.
12       Go ahead.
13       THE WITNESS:  I don't know how to answer it.
14   Yeah, I mean it -- I have had misreads.
15       MR. HADDAD:  Q.  That's a known issue with the
16   ALPR systems that you were working with with your
17   department, right?
18       A.   It's something that can occur, yes.
19       Q.   Okay.  And you talked about that in all the
20   training that you provided to officers concerning that
21   system, right?
22       A.   We did not stress misreads, but to confirm.
23   And in confirming a hit, you would also be confirming
24   what the computer saw and what you see as an officer.
25       Q.   Confirming a hit in part requires an officer to
```

```
                                    Page 47
 1   look at a license plate on the road of a moving car,
 2   right?
 3       A.   Or -- yes.
 4       Q.   Or a stationary car, right?
 5       A.   Yes.
 6       Q.   But that's the kind of police conduct that
 7   officers have done for many years in the field, right?
 8       A.   Yes.
 9       Q.   And it's not asking too much of an officer to
10   read a license plate on a moving car; is it?
11       MR. HANNAWALT:  Objection.  Argumentative,
12   beyond the scope of this designation, and it's vague.
13   If you're talking about comparison, that's different
14   than reading a plate.
15       So go ahead.
16       THE WITNESS:  Asking me to read a plate at
17   night from much distance is different than asking me to
18   read a plate during the day.
19       MR. HADDAD:  Q.  M-hm.
20       A.   I don't know what time of day; I'm assuming
21   this occurred at night.  But is it common to have to
22   read a plate?  Yes.  But at what point you can actually
23   read the plate, two different things.
24       Q.   Sometimes you might have to pull your car up to
25   within 15 or 20 feet of a car and put your headlights on
```

```
                                    Page 48
 1   the back of it before you can read a plate at night,
 2   right?
 3       MR. HANNAWALT:  Objection.  Beyond the scope of
 4   this designation, incomplete hypothetical.  This isn't
 5   about ALPR SF.
 6       MR. HADDAD:  I'm following up on his answer,
 7   but go ahead.
 8       MR. HANNAWALT:  Actually, I'll let you answer
 9   this question.
10       But you've got to stick to the designation that
11   we're here for.
12       Go ahead.  Answer that one question.
13       THE WITNESS:  It does help to illuminate the
14   license plate.
15       MR. HADDAD:  Q.  Do you know whether the ALPR
16   company, PIPS, provided any disclaimers or warnings
17   about the inaccuracy of their ALPR system?
18       A.   Not specifically, no.
19       Q.   Other than this 92 percent statement which
20   we've just talked about, can you recall any other
21   written warnings or cautions from the PIPS Company that
22   sometimes their ALPR system will misread a plate?
23       MR. HANNAWALT:  Objection.  Mischaracterizes
24   PIPS 31.  I wouldn't say that this was a caution or a
25   warning.  I think the document speaks for itself.
```

```
                                    Page 49
 1       Go ahead.
 2       THE WITNESS:  There were conversations with
 3   Jock Livorius regarding the capabilities of the systems
 4   and what would interfere with proper reading, which is
 5   based on a algorithm.  If the license plate was dirty,
 6   if it had a plastic shield on it, if it had -- you know,
 7   depending on the angle of the light, it could all affect
 8   its ability to properly interpret a plate.
 9       MR. HADDAD:  Q.  And, in fact, the ALPR system
10   had a way to go back and review misreads that the system
11   got, right?
12       MR. HANNAWALT:  Objection.  Vague.
13       THE WITNESS:  The operator wouldn't be able to
14   do that, no.
15       MR. HADDAD:  Q.  Somebody could do that, right?
16       A.   Yes.
17       Q.   In other words, the system did keep track of
18   misreads, right?
19       A.   Well, I think most of the documents you're
20   looking at refer to the 3.0 system that I'm not very
21   familiar with.  But if you were to go in and
22   specifically look at misreads, it would require the
23   operator to designate the hit and misread so it would be
24   properly categorized.
25       Q.   And did you train any officers about how to do
```

7/12/2011               DEPOSITION OF MICHAEL J. BROWN

Page 50

1  that?
2    A.  No.
3        MR. HANNAWALT:  Objection.  Mike, I think
4  you're missing something here in terms of the misreads
5  can be read through the back office system and not the
6  operator, not in the car itself.  So I don't think
7  you're intending to mislead anybody here, but --
8        MR. HADDAD:  I'm not misleading anybody.  He
9  just said it would require an officer to characterize a
10 misread as a misread in the system, and I just asked him
11 if he ever trained any officer about how to do that.
12       MR. HANNAWALT:  Actually, that's not what I
13 think you asked him, but maybe I misunderstood.
14       Go ahead.
15       THE WITNESS:  Is there a question on the table?
16       MR. HADDAD:  You answered the question.  That's
17 fine.
18       I think that about covers it.  Thanks.
19          (Whereupon the deposition was
20           adjourned at 12:16 p.m.)
21
22                    MICHAEL J. DEELY
23
24
25

Page 51

1      I, JUDY BRENNAN, a Certified Shorthand Reporter
2  duly licensed by the State of California, do hereby
3  certify:
4       That MICHAEL J. DEELY, the witness in the
5  foregoing deposition, was by me duly sworn to testify
6  the truth, the whole truth, and nothing but the truth,
7  in the within-entitled cause;
8       That said deposition was reported at the time and
9  place therein stated by me, and thereafter transcribed
10 under my direction;
11      That when so transcribed, the witness was
12 afforded the opportunity to read, correct and sign the
13 deposition.
14      I further certify that I am not interested in the
15 outcome of said action, nor connected with, nor related
16 to, any of the parties in said action or to their
17 respective Counsel.
18      IN WITNESS WHEREOF, I have hereunto set my hand
19 this 19th day of July, 2011.
20
21
22
23          _____
            JUDY BRENNAN, CSR NO. 5138
24
25