UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
DENISE GREEN, individually,      )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )  No. C10-2649 RS
                                 )
CITY AND COUNTY OF SAN           )
FRANCISCO and the SAN            )
FRANCISCO POLICE DEPARTMENT,     )
public entities; SERGEANT        )
JA HAN KIM; OFFICER ESPARZA;     )
OFFICER PEDERS; and DOES 1-10,   )
individually,                    )
                                 )
          Defendants.            )
                                 )
```

DEPOSITION OF MICHAEL NEVIN

Thursday, July 21, 2011

JUDY BRENNAN
Certified Shorthand Reporter
25634 Clover Road
Hayward, California 94542
(510) 538-1939
FAX (510) 538-5949

REPORTED BY:  JUDY BRENNAN, CSR NO. 5138

Page 2

```
 1              I N D E X
 2   Examination By:                    Page
 3   MR. HADDAD                           4
 4   MR. HANNAWALT                       56
 5
 6   Further Examination By:
 7   MR. HADDAD                          58
 8              ---oOo---
 9
10
11            E X H I B I T S
12   No.       Description              Page
13   1    4-page document entitled Renotices of    4
          Depositions Duces Tecum of Officer Brown
14        and "Persons Most Knowledgeable" Pursuant
          to FRCivP 30(b)(6)
15
     2    4-page SFPD General Order 5.02, Rev.      8
16        11/01/95 (CCSF Green 000178-000181)
17   3    3-page SFPD General Order 5.02, Revised  11
          03/16/11
18
19             ---oOo---
20
21
22
23
24
25
```

Page 3

```
 1        BE IT REMEMBERED that pursuant to Notice of
 2   Taking Deposition, and on Thursday, July 21, 2011,
 3   commencing at the hour of 10:05 a.m., at the Law Offices
 4   of HADDAD & SHERWIN, 505 - 17th Street, Third Floor,
 5   Oakland, California, before me, JUDY BRENNAN,
 6   a Certified Shorthand Reporter duly licensed by the State
 7   of California, there personally appeared
 8             MICHAEL NEVIN,
 9   called as a witness by the Plaintiff herein, who, being
10   by me first duly sworn, was examined and interrogated as
11   is hereinafter set forth.
12
13             ---oOo---
14
15          A P P E A R A N C E S
16   For Plaintiff:   HADDAD & SHERWIN
                 BY: MICHAEL J. HADDAD, Esquire
17                   GINA ALTOMARE, Esquire
                 505 - 17th Street, Third Floor
18               Oakland, California 94612
                 (510) 452-5500
19
     For Defendants:  OFFICE OF THE CITY ATTORNEY
20               BY: JAMES F. HANNAWALT
                     Deputy City Attorney
21               1390 Market Street, Sixth Floor
                 San Francisco, California 94102
22               (415) 554-3800
23
24
25
```

Page 4

```
 1            MICHAEL NEVIN,
 2   being first duly sworn by the Certified Shorthand
 3   Reporter to tell the truth, the whole truth and nothing
 4   but the truth, testified as follows:
 5
 6          EXAMINATION BY MR. HADDAD
 7        (Plaintiff's Exhibit 1 marked for
 8         identification.)
 9        MR. HADDAD:  Q.  Would you please state your
10   name and rank for the record.
11        A.   Michael Nevin, Sergeant.
12        Q.   Thank you.  And would you please spell your
13   last name.
14        A.   N-e-v-i-n.
15        Q.   Thank you.  This deposition was noticed
16   pursuant to Federal Rule of Civil Procedure 30(b)(6)
17   for, quote, the person most knowledgeable on behalf of
18   the SFPD concerning the SFPD's training, policies and
19   procedures regarding drawing and/or pointing guns at
20   people from three years prior to the incident to the
21   present, unquote.
22            Are you being produced here by the San
23   Francisco Police Department as that person?
24        A.   Yes.
25        MR. HANNAWALT:  Yes, he is.
```

Page 5

```
 1        MR. HADDAD:  The witness answered yes as well?
 2        THE WITNESS:  Yes.
 3        MR. HADDAD:  Thank you.  And I've marked this
 4   deposition notice as Exhibit 1 for the record.
 5   Q.   How long have you been employed by the San
 6   Francisco Police Department?
 7   A.   Sixteen years.
 8   Q.   So what year did you start?
 9   A.   In 1995.
10   Q.   That's what I should have asked.  And have you
11   worked for any other law enforcement agency?
12   A.   No.
13   Q.   Can you briefly take me through your career
14   with SFPD in terms of different ranks and assignments.
15   A.   I graduated from the police academy in December
16   of 1995.  I did my field training at Mission Station.  I
17   did my probation assignment at Northern Station.  I did
18   my permanent assignment at Southern Station.  I was
19   promoted to the rank of sergeant in August of 2007.  I
20   did investigations in the Burglary Detail following that
21   promotion, and then I moved to the Internal Affairs
22   Division, which at the time was called the Management
23   Control Division, and I was brought up there to work on
24   officer-involved shooting investigations in February of
25   2008 until my -- until currently.  My patrol experience
```

Page 6

1  was all in Uniform Patrol.
2      Q.  Were you ever a field training officer?
3      A.  Yes.
4      Q.  During what period of time?
5      A.  I believe I was a field training officer from
6  1998 perhaps or '99 for a few years.  I want to say
7  sometime in the beginning of the last decade I was no
8  longer a field training officer.
9      Q.  Were you ever some sort of field training
10 officer supervisor?
11     A.  No.
12     Q.  When you became a sergeant in August of '07, is
13 that when you were assigned to investigation on
14 burglaries?
15     A.  Yes.
16     Q.  And you were doing investigation of burglaries
17 until February of '08 when you went to Internal Affairs?
18     A.  Yes.
19     Q.  Have you had any involvement with your
20 department's review, revision or drafting of any
21 policies, written policies?
22     A.  Yes.
23     Q.  Which ones?
24     A.  5.02, the use of firearms.  I was involved in
25 an officer -- the officer-involved shooting study that

Page 7

1  was done by the department, and it was published in
2  January of 2009.  And that study involved review of our
3  policies and practices related to officer-involved
4  shooting investigations, as well as recommendations that
5  were made to the chief and some of which were accepted
6  by the chief at the time, Gascon, in terms of the way we
7  would do those investigations and some of the review
8  processes involved in that.
9      Q.  Any other policies that you've been involved
10 with?
11     A.  Not that I'm -- not that I can think of at this
12 time.
13     Q.  Have you been a trainer for your department on
14 any issues?
15     A.  Yes.
16     Q.  What issues?
17     A.  I have been a trainer -- I've done Force
18 Options Training, which is -- was referred to as the
19 FATS training but it's no longer referred to that
20 anymore.  It's Force Options Simulator Training.  That
21 involves a lecture given to both recruit officers and
22 advanced officers who come back for their mandatory
23 two-year training cycles.  It involves a lecture of the
24 policies, practices related to force, use of force, as
25 well as simulator evaluation and debriefing that we do.

Page 8

1  It's a four-hour course of instruction.
2      Q.  In the lecture that you would give concerning
3  Force Options Training about use of force, was that use
4  of force generally or specifically use of firearms?
5      A.  It was use of force generally that included the
6  use of firearms.
7      Q.  Any other training that you've been involved
8  in, in providing?
9      A.  I teach supervisors who get promoted in
10 officer-involved shooting investigations, the policies
11 and training that's related to that in terms of both the
12 administrative, and I work with the criminal
13 investigators in doing a presentation for supervisors
14 related to that.
15     Q.  Anything else?
16     A.  No, that's -- I think that's it.
17     Q.  Okay.  Now, when were you involved with policy
18 5.02?
19     A.  At the latter end of 2010 until it was adopted
20 by the police commission in March of this -- 2011.
21     Q.  Now, the version of 5.02 that I've been
22 provided is last revised November 1, 1995.
23         I'll mark that as Exhibit 2.
24         (Plaintiff's Exhibit 2 marked for
25         identification.)

Page 9

1      MR. HADDAD:  Q.  And show you that.
2      A.  Okay.
3      Q.  So has that policy, 5.02, which I marked as
4  Exhibit 2, substantially changed since 1995?
5      A.  Well, it depends on your definition of
6  substantial.  It's changed.  There's been revisions to
7  that document.
8      Q.  Did you bring a copy of the current policy?
9      A.  Yes.  Would you like it?
10     Q.  Please.
11         Was Exhibit 2 in effect in March of '09?
12     A.  Yes.
13         MR. HADDAD:  Could you make a couple copies of
14 this.
15         (Ms. Altomare exits and returns.)
16         MR. HADDAD:  Q.  At whose request or direction
17 were you -- strike that.
18         What specifically was your involvement with the
19 revision of policy 5.02?
20     A.  I was directed to be the subject matter expert
21 and begin working with other department members, as well
22 as the City Attorney's Office, to draft a revision.
23     Q.  Who asked you to do that?
24     A.  Well, several people.  My direct supervisors at
25 the time were involved in that, the chief of police.  I

Page 10

1  know that the police commissioners were involved as well
2  because there were several commission public meetings
3  that I was a part of that that topic came up.  The
4  Written Directives Unit was headed at the time by
5  Sergeant Paget Mitchell, who was -- that's the actual
6  unit that's responsible for written directives, which
7  this would be included under.  And she -- she as well
8  made sure that I was involved in that.  I worked through
9  her as well in terms of working through that process.
10    Q.  And so was there a committee on which you were
11  a member that was doing this work or were you given the
12  task to actually become the subject matter expert and
13  then revise the policy?
14    A.  Well, we kind of -- there were different
15  groups of people that were brought together during the
16  process.  I met with force instructors at the academy,
17  for instance, people that do training in this, range
18  people, Force Options trainers.  It went out -- you
19  know, different drafts would have gone out to
20  different command staff members who may have had some
21  input as well.  And then, of course, working with the
22  City Attorney's Office as well to go through the
23  drafting.
24       MR. HADDAD:  I'm going to mark the newest, most
25  revised version of 5.02 as Exhibit 3.

Page 11

1       (Plaintiff's Exhibit 3 marked for
2          identification.)
3       MR. HADDAD:  Q.  So what did you do to become
4  the subject matter expert on use of firearms for your
5  department?
6    A.  I believe that because I was involved in doing
7  officer-involved shooting investigations, that they felt
8  I would be somebody that should be involved in this
9  process.
10    Q.  Did you have to inform yourself about the legal
11  constraints on the use of firearms?
12    A.  I've been to many force training seminars
13  involving this.  I'm not an attorney, so that's why the
14  City Attorney's Office is involved to provide legal
15  advice regarding that.  But I've gotten knowledge over
16  my current assignment and prior to that with different
17  laws and things that relate to force.
18    Q.  I'm going to take you through some kind of
19  simple concepts.  This is for the record, so bear with
20  me.
21       But as a law enforcement officer you have to
22  know what the law is in order to enforce the law, right?
23    A.  Yes.  You have to have a working knowledge of
24  the law, correct.
25    Q.  And, of course, the law covers law enforcement

Page 12

1  officers' conduct as well and limits that conduct in
2  some situations, right?
3    A.  Yes.
4    Q.  So in order to operate lawfully as a police
5  officer, you need to know what limits the law and even
6  the constitution places on your conduct, right?
7    A.  Yes.
8    Q.  And you're trained about that throughout your
9  career, correct?
10    A.  Yes.
11    Q.  Starting at the academy, right?
12    A.  Yes.
13    Q.  And your police department's policies are
14  intended to help guide officers so that they can keep
15  their conduct lawful, right?
16    A.  Yes.
17    Q.  And that was part of your task when you were
18  ordered to revise the general order concerning use of
19  firearms, that is, to make sure that officers in your
20  department use their firearms lawfully, right?
21    A.  Yes.
22    Q.  So to that extent, as a police officer and not
23  a lawyer, you had to be aware of what the legal
24  constraints were for the use of firearms, right?
25    A.  Yes.

Page 13

1    Q.  What have you reviewed for the deposition
2  today?
3    A.  I took a look at the 5.02 policy, both the old
4  one and the new one, took a look at the use of force
5  policy in 5.01.  What other -- anything else you -- I
6  mean --
7    Q.  I'm asking what you reviewed.
8    A.  What else did I review?  I reviewed -- I did a
9  Google search, and I don't remember what I titled it,
10  but I came across some Ninth Circuit rulings regarding
11  the display and pointing of firearms.  I don't know how
12  many rulings.  There was one in particular that stands
13  out.  So I looked at like an article that I found
14  online.  It was, I believe, from January of this year it
15  was dated.  I don't think I reviewed -- I can't think of
16  anything else I reviewed.
17    Q.  Okay.  When you were ordered to revise policy
18  5.02, did anyone explain to you that one reason for this
19  revision was to account for recent case law discussing
20  pointing firearms at people?
21       MR. HANNAWALT:  Objection.  Lacks foundation,
22  assumes facts not in evidence.
23       Go ahead.
24       THE WITNESS:  I don't recall anybody making any
25  reference to that when it was directed to be revised.

Page 14

1    MR. HADDAD: Q. And do you recall anyone
2 raising any issues about what the new policy -- how the
3 new policy should address when officers point their
4 firearms at people?
5    A.  No. Not that specifically. I don't recall
6 that specifically being told to me or....
7    Q.  Both versions of policy 5.02 deal generally
8 with use of firearms, right?
9    A.  Yes.
10   Q.  And then both of those policies are broken down
11 essentially into three sections, A being General, B
12 being Handling and/or Drawing Firearms, and C being
13 Discharge of Firearms, right?
14   A.  Yes. And there's also D.
15   Q.  Reporting Discharge of Firearms.
16   A.  Right.
17   Q.  Right. And are all those subheadings, A, B, C
18 and D, considered use of firearms?
19   A.  Yes.
20   Q.  Does your department consider drawing and
21 pointing a firearm at someone as a use of force?
22   A.  It's not a -- it's not listed as a reportable
23 use of force, but I would consider it a use of force.
24   Q.  But as the person most knowledgeable on behalf
25 of your department, does your department consider

Page 15

1 drawing and pointing a gun at a person to be a use of
2 force?
3    A.  We -- we teach -- we teach about drawing -- I
4 mean, in terms of force options, we talk and train
5 regarding when it's appropriate or might not be
6 appropriate to actually draw the firearm. So that
7 training, which I'm involved with, does take place.
8    Q.  Okay. The use of firearms policies from 1995
9 and from 2010 both put some limitations --
10   A.  2011.
11   Q.  Excuse me. I'll say it again. The use of
12 firearms policies from 1995 and 2011 both put some
13 limitations on the circumstances under which officers
14 are allowed to point their guns at people, right?
15   A.  Yes. Can I say something?
16   Q.  Yes.
17   A.  Specific -- it specifically refers to drawing
18 or exhibiting.
19   Q.  Yeah. I'm going to get to that.
20   A.  Okay.
21   Q.  When the policies talk about drawing or
22 exhibiting a firearm, is that the same as or different
23 from pointing a firearm at someone?
24   A.  I think pointing a firearm could be included in
25 that.

Page 16

1    Q.  Okay. What kind of conduct is included in this
2 policy where it describes drawing or exhibiting a
3 firearm?
4       MR. HANNAWALT: Objection. Vague.
5       THE WITNESS: Can I answer?
6       MR. HANNAWALT: If you can understand the
7 question, you can answer.
8       THE WITNESS: You have to -- I think you have
9 to have reasonable cause to believe that you need it for
10 your safety or the safety of others.
11      MR. HADDAD: Q. Thank you. But what kind of
12 conduct specifically is being addressed when the policy
13 uses the words drawing or exhibiting a firearm? Does it
14 mean any kind of firearm that's pulled out of the
15 holster in public? Or you tell me. What does drawing
16 or exhibiting a firearm mean?
17   A.  Okay. Yeah. I mean, anytime you draw it in
18 public or on or off duty, if it's used in a manner
19 consistent with doing it as a law enforcement officer,
20 it needs to be done in a manner that's consistent with
21 training and policy. You have to have a reasonable
22 cause to do that.
23      You can also draw your firearm during training
24 exercises, things of that nature, that wouldn't
25 necessarily obviously have any component to a reasonable

Page 17

1 cause of, you know, facing a serious threat, but that it
2 should only be drawn or exhibited during those times
3 where there is a reason for doing so and you're able to
4 articulate that.
5    Q.  There are -- would you agree that there are
6 different levels of threat posed when an officer draws
7 his firearm and holds it at the low-ready position and
8 when an officer draws his firearm and actually points it
9 at a person?
10   A.  Can you ask me that again?
11   Q.  Yeah. Let me rephrase the question.
12   A.  Okay.
13   Q.  Does your department consider it to be a more
14 substantial use of force when an officer points his
15 firearm at a person as opposed to when an officer draws
16 his firearm and points it at the ground in the low-ready
17 position?
18   A.  I don't know that the department -- I'm not
19 aware of any policy that makes necessarily a distinction
20 to that. That could go towards -- towards some training
21 issues. But if you draw your firearm and you take it
22 out of the holster, whether or not you have it in
23 low-ready, high-ready, pointed directly at a person, the
24 fact remains that it's been -- it's drawn for the
25 purposes of the order. So you need to have a reasonable

Page 18

```
 1  cause to do that and be able to articulate why you've
 2  done it.
 3      Q.  Does your department's training and procedures
 4  teach officers about whether there's any different
 5  circumstances where they may actually point their weapon
 6  at someone as opposed to draw their weapon and use it at
 7  the low-ready?
 8      A.  Yes.  You might -- for instance, if you draw
 9  the weapon and keep it at the low-ready, it's in a
10  position to where you may be able to use it but you're
11  also doing other things as well, maybe giving verbal
12  commands or something of that nature.  Or if you
13  actually discharge the weapon and fire the weapon, we
14  actually give training as well to continue to hold the
15  weapon out in terms of breaking your concentration,
16  doing a scan, keeping the weapon at a low-ready and
17  then, when it's determined the threat is over, to go
18  ahead and secure the firearm.
19          But we teach that once you've discharged the
20  firearm at some type of threat, that we ask you to scan,
21  break your vision of concentration, and then retain and
22  holster the weapon.
23      Q.  According to your department's training and
24  procedures, is there any additional justification
25  required for an officer to point his firearm at someone
```

Page 19

```
 1  rather than hold the firearm at the low-ready position?
 2      A.  If you're pointing the firearm at somebody,
 3  you're -- you should be doing that to attempt to
 4  verbally persuade the individual to do what you want
 5  them to do, to take them into custody, or to perhaps use
 6  it either to defend yourself, defend others, or to
 7  effect an arrest.  So it should be pointed at the threat
 8  if, in fact, you're at the moment where you're intending
 9  that you may need to use it.
10      Q.  Are officers trained in your department that
11  before they point their firearm at someone, the person
12  should be more of a threat than if the officer simply
13  decides to have his weapon out at the low-ready
14  position?
15          MR. HANNAWALT:  Objection.  Vague, incomplete
16  hypothetical.
17          Go ahead.
18          THE WITNESS:  I think if you're going to pull
19  your weapon and draw your weapon and either point it at
20  somebody or keep it at a low-ready position, that there
21  needs to be some type of reasonable threat level there
22  to be able to do that.  Even if you just draw the weapon
23  and hold it at -- you're saying low-ready but, say, for
24  instance, you move the weapon to your side or point it
25  down towards the ground, even doing that would require a
```

Page 20

```
 1  reasonable cause to do that.
 2          MR. HADDAD:  Q.  All right.  And in terms --
 3      A.  It's not permitted to just draw your weapon
 4  and -- I'm not sure what position you're holding it, but
 5  you're not even -- this order is telling people that to
 6  draw it, you need to be able to get a pretty good
 7  reasonable cause to do so.
 8      Q.  So according to your department's training and
 9  procedures, an officer needs the same level of cause or
10  justification whether he holds his weapon at the
11  low-ready or points it directly at a person; is that
12  correct?
13          MR. HANNAWALT:  Objection.  Misstates
14  testimony.
15          Go ahead.
16          THE WITNESS:  I think it depends on the
17  situation and the articulation behind why an officer is
18  choosing to do that.  Clearly if you're pointing a
19  weapon at a person, you're deeming there to be -- you
20  should be deeming that to be a more significant threat
21  than if you're just pointing a weapon towards the ground
22  or away from the -- you should only -- the weapon should
23  only cover what you're willing to destroy.
24          MR. HADDAD:  Q.  That's what I'm trying to
25  understand.
```

Page 21

```
 1      A.  Okay.
 2      Q.  And I think we're getting closer now.
 3      A.  Okay.
 4      Q.  So according to your department's training and
 5  procedures, before actually pointing a firearm at
 6  someone the officer should have made a determination
 7  that the person is a more substantial threat than if the
 8  officer was simply going to have their weapon pointed at
 9  the ground low-ready, right?
10      A.  I would agree to that.
11      Q.  And that was consistent with the training and
12  procedures in effect at least since 1995; would you
13  agree?
14      A.  Yes.  And prior -- certainly prior to that as
15  well.
16      Q.  And officers that work for the San Francisco
17  Police Department by 2009 would have been expected to
18  understand that distinction as well, right?
19      A.  Yes.
20      Q.  How is the 2011 policy, which is Exhibit 3,
21  different from the 1995 policy, Exhibit 2, with respect
22  to the cause necessary to draw or exhibit a firearm?
23  Has it changed?
24      A.  A little bit.
25      Q.  Can you explain what the changes are?
```

6 (Pages 18 to 21)

Page 22

1  A. Sections -- Section B is retitled. Would you
2  like me to just kind of go through?
3  Q. Please.
4  A. Okay. So you have -- the old policy in '95
5  listed Section B as Drawing Firearms. The new policy
6  states Handling and Drawing Firearms. So it combines.
7  There's five subsections in the 1995 policy. There are
8  three subsections in the 2011 policy. The 2011 policy
9  first section talks about handling firearms and
10 manipulating firearms with department-approved firearms
11 training, and then it also talks about manually cocking
12 the hammer of the -- you're not to cock the hammer of a
13 department-issued handgun to defeat the first shot
14 double-action feature, which is not anywhere in the old
15 policy.
16     Authorized Circumstances appears to combine
17 some of the 1995 policy into one paragraph. And what
18 was carried over from the old policy to the new policy
19 is the first sentence that states, "An officer may draw
20 or exhibit a firearm in the line of duty when the
21 officer has reasonable cause to believe it may be
22 necessary for his or her own safety or for the safety of
23 others." In the old policy there's a sentence that's
24 not included in the new policy. Would you like me to
25 read that?

Page 23

1  Q. Let's just slow down for a second. The
2  sentence you just read from the new policy was also
3  contained in the old policy, right?
4  A. Not word for word, but it's -- right, it's
5  pretty close. If you look at the first sentence on the
6  old policy under Subsection 2, the first sentence there
7  is similar to the first sentence in number 2 --
8  Subsection 2 of B. And then the second sentence is --
9  is not in the new policy.
10 Q. Okay. Under both policies, though, the officer
11 had to find that it was -- strike that.
12     Under both policies the officer had to find
13 that in order to draw or exhibit a firearm, it was
14 necessary for his or her own safety or for the safety of
15 others, right?
16     MR. HANNAWALT: Objection. Misstates the
17 policy.
18     MR. HADDAD: Those words are in both policies.
19     MR. HANNAWALT: I know, but there's additional
20 words that you've omitted that make a big difference in
21 the meaning.
22     MR. HADDAD: I don't think so.
23 Q. But go ahead.
24 A. So you're asking me if that --
25 Q. Under both policies the officer had to find

Page 24

1  that in order to draw or exhibit a firearm, it was,
2  quote, necessary for his or her own safety or for the
3  safety of others, right?
4      MR. HANNAWALT: Wrong. I object. I move to
5  strike that. What it says is that the officer has a
6  reasonable cause to believe it may be necessary, not
7  that it is necessary.
8      MR. HADDAD: Q. Your department expected that
9  it would be necessary for an officer's safety or the
10 safety of others before the officer drew or exhibited a
11 firearm, right?
12     MR. HANNAWALT: Objection. Argumentative,
13 misstates the testimony.
14     You can answer.
15     THE WITNESS: No, that -- that language was
16 specifically written in the new policy to include "has
17 reasonable cause to believe it may be." I know that
18 there were conversations about that.
19     MR. HADDAD: Q. Was that a change from the old
20 policy?
21 A. I think it is because you don't see "may be
22 necessary" in that first sentence of number 2.
23 Q. So for the 1995 policy, which was in effect
24 during the time of our incident from 2009 --
25 A. Yes, sir.

Page 25

1  Q. -- in order to draw or exhibit a firearm,
2  according to your department's policy, an officer had to
3  reasonably believe it was necessary for his or her
4  safety or for the safety of others, right?
5  A. Yes.
6  Q. And under the older policy from 1995, which is
7  Exhibit 2, officers -- it also said, quote, Officers may
8  also draw and be ready to use a firearm anytime they
9  have reasonable cause to believe that they or another
10 person may be in immediate danger of death or great
11 bodily injury, unquote, right?
12 A. That's what it says, correct.
13 Q. And what's the difference between drawing or
14 exhibiting of a firearm in the first sentence of that
15 policy and drawing and be ready to use a firearm in the
16 second sentence? I'm talking about the same policy
17 here.
18 A. Oh, just this one?
19 Q. Yeah.
20 A. What's the difference between the first two
21 sentences?
22 Q. Let me rephrase the question here.
23 A. Okay.
24 Q. The first sentence talks about drawing or
25 exhibiting a firearm. Do you see that?

Page 26

1  A. Yes.
2  Q. The second sentence talks about drawing and be
3  ready to use a firearm. Do you see that?
4  A. Yes.
5  Q. What's the difference? Does the second
6  sentence pertain to the situation where an officer
7  decides to point his firearm at someone?
8      MR. HANNAWALT: Objection. Compound.
9      THE WITNESS: I don't believe that it's meant
10 to be that specific to give direction in terms of when
11 you can actually point the firearm. We don't -- we
12 don't -- these are general guidelines. We don't tell
13 officers when you point or draw. You know, if you pull
14 out the weapon and pull it to your side, we don't tell
15 them that -- we don't have a specific word to say when
16 you can actually point it at a person, if that's what
17 you're asking.
18     MR. HADDAD: Q. What does ready to use a
19 firearm mean? Does that mean point it at a person ready
20 to fire?
21 A. You could be ready -- I think you could be
22 ready to use a firearm once you've drawn it. Even if
23 it's not necessarily directly pointed at somebody, I
24 mean, you could still be ready to use it in a fraction
25 of a second by pulling it up on target.

Page 27

1  What I'm trying to say is once you draw the
2  weapon, you should be in a position where you're ready
3  to use it. Otherwise, you shouldn't -- I can't think of
4  a situation where you would draw your weapon and not be
5  ready to use it. If you draw your firearm, you should
6  be ready to use your firearm.
7  Q. Okay. Did you ever have any discussions with
8  anybody involved in the drafting of the 1995 use of
9  firearms policy?
10 A. No.
11 Q. Did you ever train officers in the 1995 use of
12 firearms policy?
13 A. Yes.
14 Q. When you did the --
15 A. Force Options.
16 Q. -- Force Options Training, you did that, right?
17 A. Yes.
18 Q. And the drawing and display of firearms is also
19 covered within the general use of force policy which is
20 5.01; is that right?
21 A. Yes, it should -- yes, it should be.
22 Q. Because it's another use of force, right?
23 A. Yes. It's listed in 5.01 as well. They don't
24 talk much about it. They refer to firearms and they say
25 basically refer to the next order. So you have 5.01,

Page 28

1  use of force, and when it mentions firearms it says
2  refer to 5.02.
3  Q. And 5.01, after some general language about the
4  policy for the use of force, then has some specific
5  sections about different types of force that can be used
6  in certain situations, right?
7  A. In 5.01?
8  Q. Yes.
9  A. Yes.
10 Q. And for firearms, though, it simply refers the
11 reader to 5.02, right?
12 A. Yes.
13 Q. Have you been involved in high-risk stops in
14 your career?
15 A. Yes.
16 Q. How many would you estimate that you've been
17 involved in personally either as a lead officer or a
18 cover officer?
19 A. I mean, I'm thinking a hundred, over a hundred.
20 I mean a substantial -- substantial number to where I
21 couldn't give you an actual number.
22 Q. Okay.
23 A. But it's been -- it's more than -- it's more
24 than dozens. So I don't -- I'm sorry I can't narrow it
25 down better for you, but a substantial number.

Page 29

1  Q. High-risk stops are trained starting with the
2  POST police academy, right?
3  A. Yes.
4  Q. Sometimes they're also called felony stops,
5  correct?
6  A. Sometimes I think, sure, they can be referred
7  to as that.
8  Q. And it's typical in a high-risk stop for
9  officers to draw and point their firearms at suspects or
10 the suspect's car, right?
11 A. I think it would be typical in those
12 situations, yes.
13 Q. That's how you're trained, right?
14 A. Yes, I think so.
15 Q. Does the use of firearms policy, 5.02, cover
16 the situation of drawing and pointing firearms in the
17 context of a high-risk stop?
18 A. Sure, it does. Even though it doesn't
19 specifically mention high-risk stop, it's meant to be
20 general instructions. So certainly those stops would be
21 covered in this.
22 Q. Okay. So your department doesn't have special
23 rules concerning drawing and pointing a firearm that
24 only apply in the context of a high-risk stop; does it?
25 A. There's special training.

8 (Pages 26 to 29)

Page 30

1  Q. Does it have special rules concerning when
2  drawing and pointing firearms may be done that apply
3  only to high-risk stops?
4  A. Not that I'm aware of.
5  Q. Okay. So whether you're in a high-risk stop or
6  the search of a house or some other context, if an
7  officer wants to draw and point his firearm at someone,
8  he or she needs to comply with policy 5.02, right?
9  A. Yes.
10  Q. And when you provided training in your
11  department concerning Force Options and you gave that
12  lecture about the use of force which included pointing
13  of firearms, was that official department training that
14  you were providing?
15  A. I don't know that the lecture -- you're
16  referring to the lecture, which is a Power Point
17  lecture, and that in and of itself has been revised over
18  time. I don't know or recall a specific Power Point
19  lecture related to the drawing of the firearm or
20  pointing of the firearm.
21  Q. Was the drawing or pointing of firearms
22  addressed at all in the training that you did with --
23  A. Yes.
24  Q. -- Force Options?
25  A. Yes. More so in the -- I would say more so in

Page 31

1  the -- when we actually go through the role simulations
2  training, you definitely see it in that aspect of the
3  four-hour block. It could possibly come up in the
4  first-hour block, lecture block, but I've seen it more
5  and been involved in it more towards the debriefings
6  following watching the officers go through the simulator
7  machine.
8  Q. Is that training that all patrol officers and
9  patrol sergeants are required to get?
10  A. Yes.
11  Q. And are they required to get it on a recurring
12  basis?
13  A. Every two years.
14  Q. Because that's considered a perishable skill;
15  is that right?
16  A. Yes.
17  Q. What's a perishable skill?
18  A. Something that if you don't practice it, you're
19  going to lose it.
20  Q. You could forget the rules if you don't get
21  retrained on it regularly; is that right?
22     MR. HANNAWALT: Objection. Calls for
23  speculation, vague.
24     MR. HADDAD: Q. I'll rephrase that. A
25  perishable skill is something that a person can lose or

Page 32

1  forget how to do properly if he or she is not retrained
2  on a regular basis, correct?
3  A. When I think of a perishable skill, I'm
4  thinking of something that you mechanically are doing
5  physically to train muscle memory and have your body
6  react to response hierarchy when you go into a mode of
7  extreme stress under high-risk situations to where your
8  body falls back on your training and you're able to
9  react quickly to deal with that. And it's more of a
10  physical manipulation that I think of when I think of
11  perishable skills as opposed to your breadth of
12  intelligence.
13  Q. Does your department require officers to report
14  when they point their firearms at a person?
15  A. No.
16  Q. They don't consider that a reportable use of
17  force, correct?
18  A. That in and of itself, correct. It's not a
19  reportable use of force.
20  Q. Is anything short of the actual discharge of a
21  firearm considered a reportable use of force?
22  A. Lots of things.
23  Q. Like what?
24  A. Physical control where a person is either
25  injured or claims to be injured.

Page 33

1  Q. I'm sorry. I mean relating to the use of
2  firearms. I'll rephrase it again.
3  A. Okay.
4  Q. Is any use of a firearm short of actual
5  discharge considered a reportable use of force?
6  A. I don't think so.
7     MR. HANNAWALT: If you hit somebody with it.
8     THE WITNESS: Yeah, that's a good point. If
9  you hit somebody with it, that's worth mentioning. If
10  exceptional circumstances were to occur and an officer
11  chose to use the firearm as a blunt --
12     MR. HADDAD: Q. An impact weapon.
13  A. -- impact weapon, that would, in fact, be a
14  reportable use of force. And that's -- that's important
15  to note.
16  Q. So since there's no requirement to report when
17  an officer points a firearm at someone, is there any way
18  that your department has to track how often that
19  happens?
20  A. If -- I don't track it and I'm unaware of any
21  specific tracking. But if that were to occur, I believe
22  it would be the job of the academy personnel,
23  specifically possibly like the PT/DT staff that collect
24  use of force data for the department. And if, in fact,
25  there is tracking going on of that, those would be the

Page 34

1  individuals that would be doing it.
2      Q.  But as the person most knowledgeable designated
3  here today, it's your understanding that there's no
4  requirement for an officer to report when he or she
5  points his firearm at another person, correct?
6          MR. HANNAWALT:  I'll object as beyond the scope
7  of the designation.
8          Go ahead.  You can answer.
9          THE WITNESS:  It could be reported, but you're
10 not required to per -- per the general orders.
11         MR. HADDAD:  Q.  As you sit here today, are you
12 aware of any system that your department has to keep
13 track of how often officers point firearms at people?
14         MR. HANNAWALT:  Objection.  Beyond the scope.
15         Go ahead.
16         THE WITNESS:  No.
17         MR. HADDAD:  Q.  Are you aware of any system
18 that your department has to keep track of the situations
19 that officers claimed justified them in pointing
20 firearms at a person?
21         MR. HANNAWALT:  I'm sorry.  Could you reread
22 that question?
23             (Record read as follows:
24             "Q.  Are you aware of any system
25             that your department has to keep

Page 35

1             track of the situations that
2             officers claimed justified them in
3             pointing firearms at a person?")
4         MR. HADDAD:  I have to rephrase that.  I don't
5  blame you.
6         MR. HANNAWALT:  Okay.
7         MR. HADDAD:  Q.  As you sit here today, are you
8  aware of any system that your department has to keep
9  track of whether officers are complying with
10 departmental policies when they point firearms at
11 people?
12     A.  I think I've answered that.  Can you ask that
13 one more time?  Am I aware of --
14         MR. HANNAWALT:  You can just have it read back.
15         THE WITNESS:  Okay.  Can you read that back?
16             (Record read as follows:
17             "Q.  As you sit here today, are you
18             aware of any system that your
19             department has to keep track of
20             whether officers are complying with
21             departmental policies when they
22             point firearms at people?")
23         THE WITNESS:  Yes.
24         MR. HADDAD:  Q.  What system is that?
25     A.  If a person were to make a complaint -- well,

Page 36

1  we have a unique system in San Francisco where if it's
2  an on-duty complaint against an officer, that those
3  complaints would go to the Office of Citizen Complaints.
4  But they would be an outlet the department can utilize
5  as well in terms of understanding if, in fact, that's
6  happening and how to adjudicate those situations,
7  investigate.
8      Q.  The Office of Citizen Complaints only gets
9  involved when a citizen makes a complaint, right?
10     A.  Yes.  But it doesn't have to necessarily be a
11 citizen that's the subject of the officer's actions.  It
12 could be any person.  It could be somebody sitting in
13 Chicago or -- we've gotten phone calls -- it's anybody
14 that makes a complaint regarding police -- alleged
15 police misconduct.
16     Q.  But if an officer points his firearm at someone
17 and no citizen ever makes a complaint about that
18 incident, your department has no way of knowing whether
19 that particular use of gunpoint was within policy 5.02,
20 right?
21         MR. HANNAWALT:  Objection.  Incomplete
22 hypothetical.  Are you talking about a situation where a
23 police report is prepared or no police report is
24 prepared?  Your factual hypothetical is too vague to
25 respond to.  I'll instruct him not to answer that

Page 37

1  question.
2          MR. HADDAD:  Q.  The Office of Citizen
3  Complaints encourages people to mediate their
4  complaints; don't they?
5      A.  Some.
6      Q.  What do you mean, some?
7      A.  Well, they don't -- they don't encourage people
8  to mediate all of them.  They certainly don't encourage
9  people to mediate all the complaints.  I know that.
10     Q.  Certain categories, though, they do encourage
11 people to mediate, right?
12         MR. HANNAWALT:  I'll object as beyond the scope
13 of the designation.
14         MR. HADDAD:  Q.  Do you know?
15     A.  I know that they do do mediation in some cases.
16     Q.  Do you know that when they mediate, they don't
17 actually investigate the complaint?
18         MR. HANNAWALT:  Objection.  Beyond the scope.
19         Go ahead.
20         THE WITNESS:  I'm not sure of their
21 investigative tacks that they use in those situations.
22         There's also another way that we can receive
23 complaints other than just the Office of Citizen
24 Complaints.
25         MR. HADDAD:  Q.  What's that?

Page 38

1  A. Any person can go to a police officer or
2  supervisor or come into our office and make a complaint
3  as well.
4  Q. Now, under policy 5.02 that was in place at the
5  time of this incident, that's Exhibit 2, what kind of
6  information did your department train officers was
7  required in order to justify pointing a gun at someone?
8      MR. HANNAWALT: Objection. Overbroad.
9      THE WITNESS: If they have reason to believe it
10 was necessary for their defense or the defense of others
11 and they can articulate a reason, justifiable cause for
12 doing so, then they would be permitted to do such.
13     MR. HADDAD: Q. And were officers required to
14 be able to articulate some threat posed by the person to
15 whom they were pointing the gun at?
16 A. Yes. An officer would have to be able to
17 articulate their reasonable -- their belief of the
18 situation and why they did what they did. They would
19 have to be able to articulate that.
20 Q. All right. Did your department have any
21 training and procedures in 2008 concerning high-risk
22 stops that required officers to make some assessment of
23 the level of threat posed by a person in the car before
24 deciding whether to point their gun at that person or
25 use their -- the low-ready position for their gun?

Page 39

1      MR. HANNAWALT: I'm sorry. Could you reread
2  back the question?
3         (Record read as follows:
4         "Q. Did your department have any
5         training and procedures in 2008
6         concerning high-risk stops that
7         required officers to make some
8         assessment of the level of threat
9         posed by a person in the car before
10        deciding whether to point their gun
11        at that person or use their -- the
12        low-ready position for their gun?")
13     THE WITNESS: This is specific to a high-risk
14 stop?
15     MR. HADDAD: Q. Yeah.
16 A. An officer would always, in my estimation, be
17 required to continually make assessments of any
18 situation when they have their firearm drawn.
19 Q. In 2009 were officers trained that they always
20 had to point their guns at suspects in a car from a
21 high-risk stop or were they given the discretion,
22 considering their assessment of the situation, to hold
23 their guns at the low-ready?
24 A. It would be up to the officer in terms of
25 whether or not they feel it necessary to point it at the

Page 40

1  person or keep it at the low-ready in terms of their
2  tactics and being in a position of advantage and
3  possibly being in a cover position or something of that
4  nature to how they're directing the firearm. But I
5  don't know that the -- I'm unaware of any training that
6  specified pointing it at the low-ready as opposed to
7  pointing it at the person. There's reasons why you
8  would do each.
9  Q. Okay. And your department allowed officers to
10 decide for themselves, based on the situation, whether
11 they point their firearm at a person in a high-risk stop
12 or hold their firearm at the low-ready, correct?
13 A. Let the officers decide?
14 Q. (Nods.)
15 A. Yes.
16 Q. And your department trained officers in how to
17 make that decision lawfully in the context of a
18 high-risk stop, correct?
19 A. I hope so.
20 Q. Well, they did provide training to officers,
21 right?
22 A. Yes. But you're asking if the training was
23 lawful.
24 Q. No, that wasn't the question.
25 A. Oh, I'm sorry.

Page 41

1  Q. Your department provided training to officers
2  so that officers could make lawful decisions in
3  high-risk stops about whether to point their weapon at a
4  person or hold their weapon at the low-ready, correct?
5  A. Yes, we provided training to -- we provided
6  training to conduct high-risk stops that involved
7  drawing your firearm.
8  Q. And one purpose for providing that training to
9  officers was so that they could make lawful decisions
10 about their own conduct in the context of a high-risk
11 stop, right?
12 A. Yes.
13 Q. So that they stayed within the law in what they
14 were allowed to do, right?
15 A. Yes. We would want that to be the case, of
16 course.
17 Q. And you trained officers to assess the threat
18 level that may differ from suspect to suspect in a
19 different high-risk stop, right?
20 A. Officers should always be doing assessments.
21 Q. Every driver in a high-risk stop vehicle is not
22 an equal threat. In other words, the officer is
23 required to consider the circumstances of each high-risk
24 stop, right?
25 A. As they evolve, I think, that's correct.

Q. And an officer is required and trained to consider any particular information the officer has about a threat posed by an individual in a car in a high-risk stop, right?
MR. HANNAWALT: Objection. Beyond the scope.
Go ahead.
THE WITNESS: You would certainly want to gain as much intelligence or information as you could in situations. That would be helpful.
MR. HADDAD: Q. And when considering whether to point his gun at a person in a high-risk stop or keep the gun at the low-ready, the officer is trained to consider the level of threat posed by the person, right?
A. Officers --
MR. HANNAWALT: Objection. Incomplete hypothetical.
Go ahead.
THE WITNESS: Officers should always consider a threat level posed by any subject that they're pointing at.
MR. HADDAD: Q. And officers are trained in that repeatedly throughout San Francisco Police, right?
A. They're trained about -- we do training in threat assessment and things of that nature.
Q. And training to consider different threat

levels when deciding different levels of force to use, right?
A. You certainly would do that, as well as -- as well as the dangers associated with complacency, which is something that we continually have to encourage officers not to find themselves in.
Q. Officers are authorized to use firearms to protect their own safety and also to protect the public safety, correct?
A. You're saying they're able to use firearms?
Q. Yeah.
A. To protect themselves and others?
Q. And the public, yeah.
A. Or they could, in fact, attempt to effect an arrest or discharge a dog, or give a call for help.
Q. Let me narrow that down.
A. Okay.
Q. Officers are allowed to point their firearms at people for their own safety or for the safety of others, correct?
A. Those are two of the included reasons, I think.
Q. Does your department train its officers that officer safety is more important than the safety of others?
A. That officer safety is more important than the

safety of others.
MR. HANNAWALT: Objection. Argumentative.
Go ahead.
THE WITNESS: I don't believe that's -- I don't believe that's the case.
MR. HADDAD: Q. Okay. Does your department train people that officer safety is more important than the safety of the suspects?
A. I've never -- I've never even had -- I don't recall having a conversation or been involved with training where we discussed not having any consideration for anybody other than ourselves. I'm not sure.
Q. These are not trick questions.
A. No, I'm just....
Q. Does your department train its officers that the safety of all human beings is equally important?
MR. HANNAWALT: Objection. Argumentative.
Go ahead.
THE WITNESS: I think the safety of all human beings is important.
MR. HADDAD: Q. Equally important?
A. I would say.
Q. Okay. That's been your experience within your department; is that right?
A. I mean, that's my experience in my department

and the way I try to live my life.
Q. Okay. Are officers allowed by your department to point their firearms at people for their own safety even when pointing their firearm in that situation would violate the person's rights?
MR. HANNAWALT: Objection. Argumentative, calls for a legal conclusion.
Go ahead.
THE WITNESS: Can you read that back to me, please?
(Record read as follows:
"Q. Are officers allowed by your department to point their firearms at people for their own safety even when pointing their firearm in that situation would violate the person's rights?")
MR. HANNAWALT: Same objections.
THE WITNESS: If you're violating the person's rights, then -- if it's already been established and concluded that you're violating the person's rights, I can't think of when you would be permitted to point your firearm at them. If it's already been concluded that you've --
MR. HADDAD: Q. Right. You're not allowed to

Page 46

1  point your firearm at someone when doing so would
2  violate their rights; would you agree?
3       MR. HANNAWALT:  Objection.  Incomplete
4  hypothetical, vague, argumentative.
5       Go ahead.
6       THE WITNESS:  I don't think so.
7       MR. HADDAD:  Q.  Just to be clear because
8  there's a transcript to be made here, according to your
9  department's training and procedures, are officers
10 allowed to point their firearms at people when to do so
11 would violate the person's rights?
12      MR. HANNAWALT:  Objection.  Argumentative,
13 incomplete hypothetical, vague.
14      Go ahead.
15      THE WITNESS:  I don't believe so.
16      MR. HADDAD:  Q.  And that's true even if it
17 would make the officer safer to have his gun pointed at
18 the person, correct?
19      MR. HANNAWALT:  Objection.  Vague, incomplete
20 hypothetical.
21      Go ahead.
22      THE WITNESS:  I don't -- I don't -- I'm just
23 going to go back to my first answer.  If you've already
24 concluded that it's a violation of somebody's rights,
25 then I'm not sure how you can justify pointing your

Page 47

1  firearm at them.
2       MR. HADDAD:  Q.  Extra officer safety does not
3  justify pointing a firearm at someone when to do so
4  would violate that person's rights; is that what you're
5  saying?
6       MR. HANNAWALT:  Objection.  Misstates
7  testimony, argumentative, vague as to the term "extra
8  officer safety."
9       Go ahead.
10      THE WITNESS:  I don't think so.
11      MR. HADDAD:  Q.  What I said is correct, right?
12      MR. HANNAWALT:  Objection.  Vague,
13 argumentative.
14      Go ahead.
15      THE WITNESS:  What I hear you saying is that
16 it's been established and concluded that somebody's
17 rights have been violated.  That's already been somehow
18 figured out and established.  I don't understand how you
19 could --
20      MR. HADDAD:  Q.  Let me rephrase the question.
21   A.  -- justify pointing a firearm in that question.
22   Q.  Where it's clear that it would violate a
23 person's rights to hold them at gunpoint.
24   A.  Who is it clear to?
25   Q.  It's objectively clear to a reasonable officer.

Page 48

1   A.  Okay.
2   Q.  Let me rephrase it.  Where it's objectively
3  clear to a reasonable officer that holding a citizen at
4  gunpoint would violate the citizen's rights, even
5  officer safety is not justified holding them at gunpoint
6  in that situation?
7   A.  Objection.  Incomplete hypothetical.
8       Go ahead.
9       THE WITNESS:  If it's not objectively
10 reasonable, then it's a violation of Graham-Connor and
11 the use of force would be -- that use of force or any
12 other use of force, if it's already been established
13 that it's objectively unreasonable, then you wouldn't be
14 permitted to do that.
15      MR. HADDAD:  Okay.  Let's take a break for a
16 minute.
17      (Recess.)
18      MR. HADDAD:  Q.  Exhibit 2, policy 5.02, says
19 in Section A, quote, It is the policy of the San
20 Francisco Police Department that officers exhaust all
21 reasonable means of apprehension and control before
22 resorting to the use of firearms, unquote.  Do you see
23 that?
24   A.  Yes, I do.
25   Q.  And does that general statement apply to

Page 49

1  drawing of firearms?
2       MR. HANNAWALT:  Objection.  Vague.
3       THE WITNESS:  Without knowing the people that
4  wrote this general order and the background in terms of
5  the conversations that took place when they wrote it, I
6  can't say for certain.  But the use of firearms and
7  drawing the firearms would probably be inclusive.
8       MR. HADDAD:  Q.  As the 30(b)(6) designee here
9  today, you've already explained that drawing of firearms
10 is considered a use of force, right?
11  A.  Yes.
12  Q.  And a use of the firearm, right?
13  A.  Yes.
14  Q.  And so as the 30(b)(6) designee today, drawing
15 of firearms is -- falls within the general rule of 5.02
16 in effect since 1995 until 2011, right?
17  A.  Yes.  But that's not in the new general order.
18  Q.  I understand.
19      But as of March 2009 the 1995 version of
20 General Order 5.02, which is Exhibit 2, was the one that
21 was in effect, right?
22  A.  Yes, it was.
23  Q.  And officers were required to follow that
24 policy; weren't they?
25  A.  Yes.

Page 50

1  Q. And they're required to be knowledgeable of
2  that policy, right?
3  A. Yes.
4  Q. Why did your department have a policy that put
5  constraints on when officers were allowed to display
6  their firearm or point their firearm at a person?
7  A. Why did we have restraints?
8  Q. Yeah.
9  A. To insure that officers used their firearms
10 appropriately. It's a big deal to be trained and be
11 permitted to use a firearm in the course of your duties.
12 So I believe we'd want to make sure our officers
13 understand the permissible circumstances as well as the
14 limitations associated with that.
15 Q. And your department wanted to make sure that
16 officers were using their firearms in a lawful manner,
17 right?
18 A. Yes, sir.
19 Q. Did your department consider it a big deal when
20 a citizen had a firearm pointed at him or her?
21     MR. HANNAWALT: Objection. Vague,
22 argumentative.
23     THE WITNESS: Did or do? Did you say did?
24     MR. HADDAD: Q. Yeah. Did.
25 A. Did the department consider -- can you ask --

Page 51

1  Go ahead.
2  Q. Yeah. Did the department consider it a big
3  deal if an officer pointed a firearm at a citizen in San
4  Francisco?
5     MR. HANNAWALT: Objection. Vague,
6  argumentative.
7     THE WITNESS: My definition of a big deal?
8     MR. HADDAD: Q. M-hm.
9  A. It's -- it's significant. I mean, it's a
10 significant situation.
11 Q. Did your department consider that citizens in
12 San Francisco who get guns pointed at them by officers
13 could have a severe emotional reaction to having a gun
14 pointed at them?
15     MR. HANNAWALT: Objection. Calls for
16 speculation, vague, may call for medical conclusions.
17     Go ahead.
18     THE WITNESS: I've never been involved in any
19 conversations or training related to a consideration of
20 somebody's mental health related to us or the department
21 pointing firearms at them.
22     MR. HADDAD: Q. Now, does your department
23 categorize different uses of force as high uses of force
24 or low uses of force or something in between?
25     MR. HANNAWALT: Objection. Beyond the scope.

Page 52

1  Go ahead.
2     THE WITNESS: I think there's higher levels of
3  force and lower levels of force. I wouldn't say we
4  refer to it as a continuum or anything of that nature,
5  but there's different categories of force. Some would
6  be, I believe you could articulate, higher and lower
7  possibly.
8  Q. As of 2009 did your department train officers
9  that pointing a gun at someone was considered a high
10 degree of force?
11    MR. HANNAWALT: Objection. Vague.
12    Go ahead.
13    THE WITNESS: I believe the department trained
14 that if you're pointing your gun at somebody, it's a
15 significant level of force.
16    MR. HADDAD: Q. Now, you've already explained
17 that a high-risk stop typically involves an officer
18 drawing a gun, right?
19 A. Typically would involve that, yes.
20 Q. And according to your department's training and
21 procedures, are high-risk stops authorized when an
22 officer has reasonable suspicion to believe that
23 occupants in a vehicle have committed some crime, or do
24 they need probable cause before they can do the
25 high-risk stop?

Page 53

1  A. Reasonable suspicion.
2  Q. So according to your department's training and
3  procedures, reasonable suspicion is enough to -- for an
4  officer to draw a firearm and hold a person at gunpoint
5  in the context of a high-risk stop; is that correct?
6  A. Yes.
7  Q. The general order concerning use of force,
8  which is 5.01, states, Officers are permitted to use
9  whatever force is reasonable and necessary to protect
10 others or themselves but no more, unquote. Are you
11 familiar with that statement from the use of force
12 policy?
13 A. Yes.
14 Q. Would you like me to show it to you?
15 A. Sure. I may have a -- I may have a copy.
16 Q. It's okay. I'm just going to ask you about
17 that particular sentence. It's on the first page, first
18 sentence of Section C. Do you see that?
19 A. Yes, I see the first sentence of Section C.
20 Q. Okay. That was also in effect in 2009,
21 correct?
22 A. Yes.
23 Q. And did that sentence from the use of force
24 policy also apply to the use of firearms?
25 A. Yes, it does.

Page 54

1    Q.   And it applies also to the display and pointing
2  of a firearm at a person as well?
3    A.   Yes, it does.
4    Q.   And, in general, your department only allows a
5  use of force where that use of force is necessary under
6  the circumstances; is that correct?
7        MR. HANNAWALT:  Objection.  Beyond the scope.
8        Go ahead.
9        THE WITNESS:  If you have reasonable cause to
10 believe it's necessary, then you can use a force option.
11       MR. HADDAD:  Q.  Did you want to add anything?
12   A.   The last....
13   Q.   Have you made any review of the specifics of
14 this case or this incident involving Ms. Green?
15   A.   Have I done what?  I'm sorry.
16   Q.   Any review of the Green incident?
17   A.   I've (indicating) --
18   Q.   Other than talking to Counsel?
19   A.   No.
20   Q.   In the context of a high-risk stop, is it
21 appropriate for an officer to continue to hold a subject
22 at gunpoint even after the subject has been handcuffed
23 and searched?
24       MR. HANNAWALT:  Objection.  Incomplete
25 hypothetical.

Page 55

1        MR. HADDAD:  Q.  Let me rephrase the question.
2        In the context of a high-risk stop, is it
3  permissible for an officer to continue to hold a person
4  at gunpoint after that person has been handcuffed?
5        MR. HANNAWALT:  Objection.  Incomplete
6  hypothetical.
7        THE WITNESS:  I guess it would depend on all
8  the facts and circumstances surrounding that particular
9  incident.
10       MR. HADDAD:  Q.  And what would be
11 justification for continuing to hold a handcuffed person
12 at gunpoint in the context of a high-risk stop?
13   A.   If the person were in a position to where I or
14 an officer had them positioned but I hadn't yet gotten
15 to an area of the vehicle that was stopped to begin with
16 and I was uncertain as to whether or not that vehicle
17 was still occupied by other individuals, I could see how
18 an officer would have their gun drawn still at that
19 moment because the situation might not still be
20 controlled.
21   Q.   And going back to General Order 5.02, the
22 version in effect at the time of this incident,
23 Section B4 says, quote, When an officer determines that
24 the danger is eliminated, the handgun shall be holstered
25 or the shoulder weapon held in a port arms position away

Page 56

1  from the person, unquote, correct?
2    A.   That's what it says, correct.
3    Q.   And that was the rule that had to be followed
4  at the time of the Green incident, right?
5    A.   Yes.
6        MR. HADDAD:  Okay.  That's all I have.  Thank
7  you.  We're done.
8
9        EXAMINATION BY MR. HANNAWALT
10       MR. HANNAWALT:  Q.  Well, actually, I have a
11 couple follow-ups on 5.02.
12       The last question that was just asked you about
13 policy B4, where it says that the -- when the officer
14 determines the danger is eliminated, the handgun shall
15 be holstered, is that who you were talking about why the
16 gun wouldn't be holstered if the car wasn't cleared?
17   A.   Yeah, because the danger hasn't been
18 eliminated.
19   Q.   Okay.  And you were asked some questions about
20 the first section, A, about the general policy about
21 officers exhausting all reasonable means of apprehension
22 and control before resorting to the use of firearms.  Do
23 you recall that?
24   A.   Yes.
25   Q.   Mr. Haddad didn't ask you about the next

Page 57

1  sentence.  Can you read that into the record?
2    A.   "Officers, however, shall not unnecessarily or
3  unreasonably endanger themselves in applying the
4  policies and procedures contained in this order in
5  actual situations."
6    Q.   And how does that policy or that part of the
7  policy relate to the pointing of firearms in a high-risk
8  stop situation?
9    A.   I would say that in a high-risk stop situation
10 you should not become comfortable or get -- or become
11 complacent until you're certain that any threat has been
12 eliminated or neutralized.
13   Q.   And how does that sentence, the second sentence
14 of capital A under the general policy, how does that
15 relate to the initial use of firearms in a high-risk
16 stop?
17   A.   If you have a high-risk stop the way we've, I
18 think, defined it today and the way I understand it, you
19 have a situation where an officer would have to have
20 reasonable cause to believe that they need to draw their
21 firearm for the purposes of defending themselves or
22 others from a threat that they're attempting to
23 determine.  And so that's how that -- that's how that
24 section, I guess, would relate.
25   Q.   Okay.  Based on your experience and training as

Page 58

1  the person most knowledgeable regarding the pointing of
2  firearms, would the pointing of firearms at a high-risk
3  stop subject violate the general policy of the
4  department that officers exhaust all reasonable means of
5  apprehension and control before resorting to the use of
6  firearms?
7      A.  No, it wouldn't.
8      Q.  Why not?
9      A.  Because a high-risk stop, if we're defining a
10 high-risk stop, you're associating that with an inherent
11 danger that needs to be identified or dealt with.
12 Otherwise, it's not a high-risk stop.
13         MR. HANNAWALT:  All right.  Thanks.  That's all
14 I have.
15
16          FURTHER EXAMINATION BY MR. HADDAD
17         MR. HADDAD:  Q.  And just a little follow-up.
18         You already explained that an officer is
19 required to have reasonable suspicion of something
20 before doing a high-risk stop.  What is an officer
21 supposed to have reasonable suspicion of before doing a
22 high-risk stop?
23         MR. HANNAWALT:  Objection.  Incomplete
24 hypothetical, overbroad.
25         Go ahead.

Page 59

1         THE WITNESS:  That the vehicle and/or the
2  occupants that you're stopping are involved in some type
3  of criminal activity related to the possibility of a
4  whole host of things.  Either, A, the vehicle could be
5  stolen, could be involved in some type of violent crime.
6  We know that vehicles that are stolen tend to be
7  occupied by persons that are trying to elude capture by
8  the police, and, therefore, those situations are
9  considered high risk.
10        MR. HADDAD:  Q.  And so when -- strike that.
11        Your department's high-risk policies,
12 procedures and training, high-risk stop -- let me say it
13 again.
14        Your department's high-risk stop policies,
15 procedures and training require an officer to have
16 reasonable suspicion that the vehicle being stopped or
17 its occupants have been involved in some recent felony;
18 is that accurate?
19        MR. HANNAWALT:  Objection.  Incomplete
20 hypothetical.
21        Go ahead.
22        THE WITNESS:  It doesn't have to be recent.
23        MR. HADDAD:  Q.  Okay.  Does it have to be a
24 felony?
25     A.  I believe it would have to be -- I believe

Page 60

1  you'd have to reasonably believe that some type of
2  violent -- potentially violent situation or felony
3  situation.
4         MR. HANNAWALT:  And I'll object as beyond the
5  scope as to that last question.
6         Go ahead.
7         MR. HADDAD:  Q.  So before officers are
8  authorized to point their guns at people in the context
9  of a high-risk stop, your department's training
10 anticipates that they will have already determined, at
11 least with reasonable suspicion, that the occupants are
12 involved in some sort of violent crime or violent
13 felony; is that right?
14        MR. HANNAWALT:  Objection.  Misstates the
15 testimony.
16        Go ahead.
17        THE WITNESS:  No, you don't need to know that
18 that's a violent crime.  You would have to believe that
19 the vehicle involved -- if you're looking at a vehicle
20 and you're stopping a vehicle in a high-risk stop that
21 encompasses many different things and you believe that
22 it could be a stolen vehicle, that's going to be a
23 high-risk situation until you're able to determine that
24 it's not just because we don't have all the specific
25 information about that person who stole that vehicle and

Page 61

1  what they're potentially wanted for.  Until we're able
2  to investigate and exhaust that, we'd want to treat that
3  as a special vehicle stop, which is what we're referring
4  to as a high-risk stop.
5         MR. HADDAD:  Q.  So is it your department's
6  policy and procedure to do a high-risk stop anytime
7  officers have reasonable suspicion to believe the
8  vehicle is stolen?
9      A.  Yes.  I believe officers, if they believe the
10 vehicle to be stolen, would -- would conduct a high-risk
11 stop on that vehicle.
12     Q.  And just going back to the situation where
13 officers continue to hold a person at gunpoint after
14 they've been handcuffed, you explained that it can be
15 appropriate under the policy to keep weapons outside of
16 the holster until the car has been searched, right?
17     A.  Yes.
18     Q.  And that's because there could be a threat
19 still remaining inside the vehicle that hasn't been
20 found out yet, right?
21     A.  Yes.
22     Q.  But in that situation the threat is at the
23 vehicle and not at the handcuffed person who is some
24 distance from the vehicle, right?
25        MR. HANNAWALT:  Objection.  Assumes facts not

Page 62

1  in evidence, calls for speculation, incomplete
2  hypothetical. You haven't stated where the person is.
3      Go ahead.
4      THE WITNESS: If that person hasn't been
5  searched yet in an area where their hands are, I would
6  want to insure that that search takes place before I
7  would no longer have my vehicle -- I mean, my firearm
8  pointed at that individual. So the simple act of
9  handcuffing somebody doesn't necessarily mean that I've
10 sufficiently eliminated that threat, just the simple act
11 of handcuffing.
12     MR. HADDAD: Q. Okay. So there are some
13 people who could still pose a threat to officers even
14 after they're handcuffed?
15   A.  Absolutely.
16   Q.  And there are some people who reasonable
17 officers would understand would not pose a threat after
18 they've been handcuffed; is that accurate?
19     MR. HANNAWALT: Objection. Vague, calls for
20 speculation, incomplete hypothetical.
21     Go ahead.
22     THE WITNESS: Yes, there are -- yes.
23     MR. HADDAD: Q. And officers have to assess
24 the situation before deciding whether to continue
25 holding a person at gunpoint after they've been

Page 63

1  handcuffed in a high-risk stop, right?
2   A.  Officers should be continually assessing
3  situations from beginning to end.
4   Q.  It's not appropriate to hold every person at
5  gunpoint even after the person is handcuffed in every
6  single high-risk stop; is it?
7   A.  No.
8      MR. HADDAD: Okay. That's it. Thanks.
9      MR. HANNAWALT: Great. Thank you.
10     (Whereupon the deposition was
11     adjourned at 11:35 a.m.)
12
13              MICHAEL NEVIN

Page 64

1      I, JUDY BRENNAN, a Certified Shorthand Reporter
2  duly licensed by the State of California, do hereby
3  certify:
4      That MICHAEL NEVIN, the witness in the foregoing
5  deposition, was by me duly sworn to testify the truth,
6  the whole truth, and nothing but the truth, in the
7  within-entitled cause;
8      That said deposition was reported at the time and
9  place therein stated by me, and thereafter transcribed
10 under my direction;
11     That when so transcribed, the witness was
12 afforded the opportunity to read, correct and sign the
13 deposition.
14     I further certify that I am not interested in the
15 outcome of said action, nor connected with, nor related
16 to, any of the parties in said action or to their
17 respective Counsel.
18     IN WITNESS WHEREOF, I have hereunto set my hand
19 this 22nd day of July, 2011.

23     _____
       JUDY BRENNAN, CSR NO. 5138

---

July 22, 2011

Sergeant Michael Nevin
c/o James F. Hannawalt
Deputy City Attorney
Office of the City Attorney
1390 Market Street, Sixth Floor
San Francisco, California 94102
Re: Denise Green vs. City and County of San Francisco
    Deposition taken on July 21, 2011

Dear Sergeant Nevin:

The transcript of your deposition taken in the
above-entitled action is now available for your review.
You have 30 days following receipt of this letter to read,
correct and sign your deposition. ANY CHANGES IN FORM OR
SUBSTANCE THAT YOU MAKE MUST BE ACCOMPANIED BY A STATEMENT
OF THE REASONS FOR MAKING THEM.
If the deposition is not signed after the 30-day period,
it may then be used as though signed.

Should you wish to sign the original deposition
transcript, kindly telephone our offices for an
appointment.

Sincerely,


Judy Brennan, CSR

cc: Original
    Michael J. Haddad, Esquire
    James F. Hannawalt, Esquire